## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| DOMINICK RUSSO; JAMES RUSSO; FFC SEAFOOD, INC., | Civil Action No. _____ |
| Plaintiffs, | |
| v. | |
| GINA RAIMONDO, in her official capacity as Secretary of the United States Department of Commerce; JANET COIT, in her official capacity as Assistant Administrator for Fisheries; and NATIONAL MARINE FISHERIES SERVICE, | **COMPLAINT** |
| Defendants. | |

## INTRODUCTION

1.     Plaintiffs are individual fishermen and a family-owned business that fish in the Gulf of Mexico. Among the fish that they rely on are gag grouper, a reef fish.

2.     A regulation issued by the National Marine Fisheries Service has slashed the number of gag grouper available to Plaintiffs by over 80%.

3.     This regulation, however, was unlawfully promulgated. Under the relevant rulemaking provisions, the National Marine Fisheries Service is only permitted to promulgate a final rule that has been approved by a federal policymaking body called the Gulf of Mexico Fishery Management Council.

4.     The Gulf Council, however, has not lawfully approved the rule at issue. While individuals purporting to hold Council seats voted in favor of the rule, they were never appointed to the Council pursuant to the Appointments Clause of the Constitution, which is the exclusive method of filling Council seats. These individuals therefore never wielded the Council's power, and their actions as Council members are void.

5.     The Council has also failed to lawfully approve the rule at issue because its members cannot legally wield executive power. The Council members' tenure protections insulate them from Presidential removal in violation of the Executive Vesting Clause and the Take Care Clause. Due to these unconstitutional restrictions on removal, the Council members never lawfully wielded the Council's power, and their actions as Council members are void.

6.     Without the Council's lawful approval, the National Marine Fisheries Service was not empowered to issue the regulation. The Court should therefore vacate the regulation.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); *id.* § 2201 (authorizing declaratory relief); *id.* § 2202 (authorizing injunctive relief); 16 U.S.C. § 1855(f) (providing for judicial review of Magnuson-Stevens Act regulations pursuant to the Administrative Procedure Act); and *id.* § 1861(d) (providing district court jurisdiction over cases arising under the Magnuson-Stevens Act).

8.      Venue in the Southern District of Alabama is proper pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PARTIES

### *Plaintiffs*

9.      Plaintiff Dominick Russo is thirty-seven years old and lives in Sarasota, Florida. Dominick owns 50% of Plaintiff FFC Seafood, Inc. ("FFC Seafood") and is the Vice President of FFC Seafood. Dominick started in the commercial-fishing industry when he was 13 years old.

10.      Plaintiff James Russo is forty-seven years old and lives in Tampa, Florida. James owns 50% of Plaintiff FFC Seafood and is the President of FFC Seafood. James has been in the commercial-fishing industry for 30 years.

11.      Plaintiffs James and Dominick Russo are commercial fishermen who work in the fisheries managed by the Council. They possess the vessel, gear, and permit necessary to fish for gag grouper. They have fished for gag grouper in the past and intend to fish for gag grouper this year. They intend to fish for gag grouper in future years as well. They would fish for more gag grouper than the allotted quota this year and in the future but for the Final Rule's limit on the amount of gag grouper that can be fished in a season.

12.      Plaintiff FFC Seafood is a commercial fishing business located in Sarasota, Florida. FFC Seafood possess the necessary permits to catch gag grouper in the Gulf of Mexico and it runs two commercial fishing boats.

13. FFC Seafood boats actively catch gag grouper during the season. Amendment 56 significantly reduces the amount of gag grouper FFC Seafood is allowed to catch in a season. FFC Seafood intends to continue to fish for gag grouper to the extent permitted by law.

*Defendants*

14. Gina Raimondo is the Secretary of Commerce and is charged with administering the Magnuson-Stevens Act. She is sued in her official capacity only.

15. Janet Coit is the Assistant Administrator for Fisheries, which directs the National Marine Fisheries Service. The Secretary of Commerce has delegated to the NOAA Administrator the authority to administer the relevant portions of the Act; and the NOAA Administrator has subdelegated that authority to the Assistant Administrator. Pursuant to that authority, the Assistant Administrator determined that the final rule is consistent with applicable law. She is sued in her official capacity only.

16. The National Marine Fisheries Service ("NMFS"), also known as NOAA Fisheries, is an agency within the Department of Commerce. NMFS is responsible for the promulgation of the final rule. 89 Fed. Reg. 40,419 (May 10, 2024) ("Final Rule").

## FACTUAL ALLEGATIONS

17. Plaintiffs fish in the waters managed by the Council and are reliant on fishing for their incomes.

18. Plaintiffs hold permits to fish for Gulf of Mexico reef fish, which includes gag grouper.

19.    The federal fisheries of the Gulf of Mexico are governed, in part, by the Fishery Management Plan ("FMP") for the Reef Fish Resources of the Gulf of Mexico ("Reef FMP"). The Reef FMP regulates and manages gag grouper and other reef fish. Under the Plan, the Annual Catch Limits ("ACLs") of gag grouper are divided between recreational and commercial fishermen.

20.    Fourteen of the fifteen present individuals purporting to hold Council seats voted in favor of amending the Reef FMP in June 2023 at a meeting in Mobile, Alabama. The amendment is known as Amendment 56.

21.    At the time that NMFS and the Council developed Amendment 56, the Council determined that NMFS could not likely implement a potential final rule until 2024. However, it determined that maintaining the previously implemented catch limits for gag in 2023 would continue to allow overfishing. Therefore, the Council requested NMFS implement interim measures to reduce gag stock ACL from 3.120 million pounds to 661,901 pounds. NMFS agreed and implemented these interim measures through a temporary rule effective on May 3, 2023. 88 Fed. Reg. 27,701 (May 3, 2023). The measures in the temporary rule were initially effective for 180 days, and then NMFS extended them for up to 186 additional days, through May 2, 2024, 88 Fed. Reg. 69,553 (Oct. 6, 2023), providing NMFS time to solicit and review public comments on the proposed rule and Amendment 56 and prepare final regulations as appropriate.

22.    Because NMFS found that the harvest of gag grouper would reach the new interim quota on October 19, 2023, NMFS announced on September 29, 2023,

that the commercial harvest of gag grouper in federal waters of the Gulf of Mexico would close at 12:01 a.m., local time, on October 19, 2023, until the 2024 fishing season opened.[1]

23.     On October 18, 2023, NMFS announced the availability of Amendment 56 to the Reef FMP and requested comments. 88 Fed. Reg. 71,812 (Oct. 18, 2023).

24.     Amendment 56 lowered the total gag grouper Acceptable Biological Catch from 3,120,000 pounds to 444,000 pounds and revised the sector allocations in favor of the recreational fishermen. Previously, the sector allocations were 39% of the overall quota for the commercial sector and 61% for the recreational sector. Amendment 56 lowered the commercial sector allocation to 35% and raised the recreational sector allocation to 65%. These decisions resulted in a revised commercial ACL of 155,000 pounds and a revised recreational ACL of 288,000 pounds. *Id.* at 77,249. The Acceptable Catch Targets (the actual quotas under which fishermen operate after a buffer is applied to reduce the risk of hitting the ACL) were reduced even further, to only 147,000 pounds for the entire commercial sector.

25.     NMFS determined Amendment 56 was lawful on January 17, 2024. 89 Fed. Reg. at 40,419.

26.     The putative Council members also approved a proposed regulation to implement Amendment 56. After their approval, NMFS determined the proposed rule

---

[1] *Recreational Closure of Gag Harvest in Federal Waters of the Gulf of Mexico*, NOAA Fisheries (Sept. 29, 2023), https://www.fisheries.noaa.gov/bulletin/recreational-closure-gag-harvest-federal-waters-gulf-mexico.

was lawful and, on November 9, 2023, published the proposed rule for comment. 88 Fed. Reg. 77,246.

27.    On May 10, 2024, NMFS published the Final Rule implementing Amendment 56. The changes—which reflect a nearly 85% decrease in the commercial catch limit for gag grouper from 2023 to 2024—are effective June 1, 2024.

## LEGAL BACKGROUND

### Federal Fisheries Management

28.    In the United States, the state and federal governments share authority to regulate ocean fisheries. States govern nearshore waters, from the shoreline to three nautical miles (nine nautical miles in the case of Texas and the west coast of Florida), while federal authority extends from the state seaward boundary to 200 nautical miles offshore.

29.    Federal fisheries are regulated principally through the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d (the "Magnuson-Stevens Act" or "Act"). The Act's purpose is to provide a framework for the management of fisheries to maximize their long-term benefits, including for commercial fishermen. *See* 16 U.S.C. §§ 1801, 1851.

30.    This purpose is realized through FMPs and FMP amendments, which are developed by the eight Regional Fishery Management Councils and then approved as lawful by the Secretary or her delegate. *See id.* §§ 1852, 1854(a).

31.   The Secretary may assist in the councils' development of FMPs through "advisory guidelines," but these guidelines "shall not have the force and effect of law." *Id.* § 1851(b).

32.   Approved FMPs and FMP amendments are implemented through regulations, which are proposed by the regional councils and then approved as lawful and promulgated by the Secretary or her delegate. *See id.* §§ 1853(c), 1854(b).

33.   Although FMPs, FMP amendments, and implementing regulations are subject to the Secretary's approval, she may only reject a measure if it violates applicable law; she is not empowered to object to these measures on policy grounds. *See id.* § 1854(a)(3), (b)(1).

34.   The Secretary must consult with the Council before making any revisions to the Council's proposed regulations, *id.* § 1854(b)(3), but the Secretary has no authority to compel a consultation. *See Oceana, Inc. v. Ross*, No. 17-cv-5146, Docket No. 124, at 8–9 (C.D. Cal. Nov. 18, 2019) (government brief) ("NMFS has repeatedly attempted to consult with the Pacific Council," but "NMFS lacks the authority to *compel* the independent Pacific Council to place this item on its agenda or deliberate further on this subject.").

35.   The Secretary has delegated her authority under the Act to approve as lawful FMPs, FMP amendments, and implementing regulations to the NOAA Administrator, who has delegated his authority to the Assistant Administrator for Fisheries. NOAA, NOAA Organizational Handbook: Transmittal No. 61, at 2–3 (Feb.

24, 2015) ("NOAA Handbook"). The Assistant Administrator for Fisheries is neither nominated by the President nor confirmed by the Senate.

36.    The Assistant Administrator has further subdelegated rulemaking powers to the NMFS Deputy Assistant Administrator for Regulatory Programs ("DAARP"). *See* NOAA Handbook at 5. The DAARP, who manages policy and regulations within NMFS, may exercise these rulemaking powers without the concurrence of the Assistant Administrator or other senior officials. The current DAARP is Samuel D. Rauch III, a career civil servant.

37.    Mr. Rauch approved the Final Rule for publication in the Federal Register.

## Regional Fishery Management Councils

38.    The Gulf of Mexico Fishery Management Council ("Council") is one of eight regional fishery management councils established by the Magnuson-Stevens Act. The Magnuson-Stevens Act created the Council to be an independent policymaking body and to manage fisheries in federal waters seaward of the state boundaries of Texas, Louisiana, Mississippi, Alabama, and Florida. 16 U.S.C. § 1852(a)(1)(E) (the Council "*shall have authority over* the fisheries in the Gulf of Mexico" (emphasis added)).

39.    The Council is an independent entity within the Executive Branch, not contained within any other agency or Executive Department.

40.     The Council has 17 voting members. *Id.* A quorum is a majority of the Council, and the Council acts by majority vote of those present and voting. *Id.* § 1852(e)(1).

41.     The Act provides that one voting member of the Council is "[t]he regional director of [NMFS] for the geographic area concerned, or his designee . . . ." *Id.* § 1852(b)(1)(B). The relevant official here is the Regional Administrator for NMFS's Southeast Regional Office.

42.     The Southeast Regional Administrator has not been appointed by the President, a head of department, or a court of law.

43.     The Southeast Regional Administrator is a career official in the Senior Executive Service. He is removable only for cause. 5 U.S.C. §§ 3592, 7541-43.

44.     The Act also provides that five voting members of the Council are the principal state officials with marine fishery management responsibility and expertise in each constituent state, who are designated as such by the governors or their respective states, so long as the officials continue to hold such position, or the designees of such officials. *See* 16 U.S.C. § 1852(b)(1)(A).

45.     The Act does not permit the President or the Secretary to remove the five state officials from the Council.

46.     The Act provides that the remaining eleven members are nominated by the governors of Texas, Louisiana, Mississippi, Alabama, and Florida. *Id.* § 1852(b)(2)(C). The Secretary must select from the governors' nominees for these eleven seats. *Id.* § 1852(a)(1)(E).

10

47.    One member must be appointed from each member state, and the remaining six at-large members may be appointed from any member-state governor's list of nominees. *See id.*; 50 C.F.R. § 600.215(a)(2)(iii).

48.    The Secretary may reject a slate of nominees for a position only if the nominees fail to satisfy certain minimal objective qualifications provided by statute, in which case the governor may revise the list or resubmit the original list with additional explanations of the individuals' qualifications. *Id.* The Secretary may not reject a slate of nominees on the basis of the nominees' judgment, policy prescriptions, or character. *See id.*

49.    The Act permits the Secretary to remove a governor-nominated member for only one of two reasons. First, if the Council recommends removal by a two-thirds majority of voting members and states the basis for the recommendation. *Id.* § 1852(b)(6). Second, if the member violates 16 U.S.C. § 1857(1)(O), a financial conflict-of-interest provision. *Id.* § 1852(b)(6).

## The Appointments Clause

50.    The Appointments Clause of the United States Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States." U.S. Const. art. II, § 2, cl. 2.

51.    This requirement applies to both principal (non-inferior) officers and inferior officers, except that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

52.    The Clause's main purpose is to ensure that government officials wielding significant authority are accountable to the President and other democratically accountable officers.

53.    "[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by" the Appointments Clause. *Buckley v. Valeo*, 424 U.S. 1, 126, 140–41 (1976) (per curiam).

54.    The Appointments Clause is not limited to officials with authority to "enter a final decision" on behalf of the United States; it applies to any official who "exercise[s] significant discretion" in "carrying out . . . important functions." *Freytag v. Commissioner*, 501 U.S. 868, 881–82 (1991).

55.    Rulemaking is a significant authority which only an officer may exercise. *Buckley*, 424 U.S. at 140–41.

56.    A person exercising officer powers may be appointed as an inferior officer if his "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997).

57.    A "timely" petitioner challenging a final action of an improperly appointed officer, if successful, is "entitled" to "whatever relief may be appropriate," including having the action set aside. *See Ryder v. United States*, 515 U.S. 177, 182–83 (1995) (The de facto officer doctrine does not apply where the Appointments Clause

is at issue, because it is a "basic constitutional protection[] designed in part for the benefit of litigants." (citation omitted)).

### The Executive Vesting Clause and The Take Care Clause

58.     Article II's Executive Vesting Clause, together with the Take Care Clause, empowers the President to remove officers at will. *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 484, 492 (2010); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 218 (2020). The removal power ensures that officers, once appointed, remain under the President's control so that he can ensure—and be accountable for—the faithful execution of the laws. This power persists even if the President can control an officer through other means, such as the budget process and regulations. *Free Enter. Fund*, 561 U.S. at 504.

59.     Congress may bestow tenure protection only on two small categories of officers: (1) "multimember bod[ies] of experts, balanced along partisan lines, that perform legislative and judicial functions and [are] said not to exercise any executive power," and (2) "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2199–2200.

60.     Even among the two categories of officers who may enjoy tenure protection, the protection must be "[]appropriate for officers wielding the executive power of the United States." *Free Enter. Fund*, 561 U.S. at 503. Thus, Congress "may not eliminate the President's removal power altogether" for any officer. *Seila Law*, 140 S. Ct. at 2205. And Congress may not create more than one level of tenure protection—that is, grant tenure protection to an officer who may be removed only by

another officer with tenure protection. *Free Enter. Fund*, 561 U.S. at 493. No tenure protection may be so stringent as to "impede the President's ability to perform his constitutional duty." *Seila Law*, 140 S. Ct. at 2199 (alteration omitted) (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988)).

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

61.    Each of the Plaintiffs has a significant interest in whether the Final Rule was lawfully promulgated. The Final Rule significantly reduces gag grouper fishing opportunities for all Plaintiffs, inflicting detrimental financial impacts, in addition to reducing the value of the Russo brother's permits, vessels, and gear. Therefore, a decision declaring unlawful and voiding the Secretary's promulgation of the Final Rule's quota allocations would remedy these injuries by preserving the value of Plaintiffs' assets and enabling Plaintiffs to continue to catch gag grouper at their current rates.

62.    Plaintiffs have no plain, speedy, and adequate remedy at law for their injuries. Money damages in this case are not available.

63.    This case is currently justiciable because the Final Rule reduced the commercial catch limits of gag grouper beginning on June 1, 2024.

## CLAIMS FOR RELIEF

### COUNT I: Appointments Clause

*Issuance of a Rule by the National Marine Fisheries Service Not in Accordance with Law, Contrary to Constitutional Right and Power, in Excess of Statutory Jurisdiction, Authority, and Limitations, and without Observance of Procedure Required by Law* **(5 U.S.C. § 706(2))**

64.    The preceding paragraphs are incorporated herein by reference.

14

65.    Council seats are offices of the United States and so may be filled only pursuant to the Appointments Clause, because the Council seats are continuing positions vested with significant authority pursuant to the laws of the United States, including rulemaking powers.

66.    Council seats are continuing offices established by law. *See* 16 U.S.C. § 1852. The positions themselves are established by statute and continue in perpetuity. *Id.* Eleven members serve, continuously, for a term of three years, which can be extended for up to three consecutive terms. *Id.* § 1852(b)(3). The Act provides that the five state Governor designees serve "so long as the official continues to hold such position [as the principal state official with marine fishery management responsibility and expertise]"—in other words, indefinitely. *Id.* § 1852(b)(1)(A). The Regional Administrator also serves indefinitely.

67.    Under the Magnuson-Stevens Act, the Secretary has no discretionary authority over the FMPs or FMP amendments. The Secretary must, upon receiving an FMP or FMP amendment prepared by a Council, immediately review it for consistency with statutorily defined national standards and applicable law. 16 U.S.C. § 1854(a)(1)(A). The Secretary can only disapprove, fully or partially, an FMP or FMP amendment prepared by a Council for inconsistency with applicable law and must then report such inconsistency to the Council. *Id.* § 1854(a)(3). If the Secretary does not make such a report, the FMP or amendment automatically goes into effect, as if it had been approved by the Secretary. *Id.* § 1854(a)(3)(C). In other words, an FMP

amendment from the Council can go into effect without review by the Secretary. The Secretary cannot reject an amendment for policy reasons.

68.    Proposed Council regulations may be blocked only for inconsistency with law, not policy. *See id.* § 1854(b). Thus, under the Act, the Council and its members are endowed with significant authority to make federal fishery policy.

69.    The Council also possesses significant authority because it decides when the rulemaking process starts, its decisions have an independent effect because it is the Council's handiwork that is implemented, if approved, the Council assembles the record on which any ultimate final rule is based, and the Council may block Secretarial actions on policy grounds.

*Unlawful Principal Officers*

70.    Council members must be appointed as principal officers because they are not supervised by anyone who is appointed by the President with the advice and consent of the Senate. By design, the Council is insulated from the President and other executive officers. Council members are not removable at will but rather enjoy extraordinarily strong protections against removal. *See id.* § 1852(b)(6). They have wide discretion over policy decisions. *See id.* § 1854(a)(3), (b). And they operate largely independent of external direction: they set their own priorities, establish and direct their own staff, and create their own operating procedures. *Id.* § 1852(e), (g)–(i).

71.    Council members must be appointed as principal officers for an independent reason. Because the Council is a freestanding entity within the Executive Branch, it constitutes an Executive department for constitutional

purposes, and the Council members collectively constitute a head of a department. *Free Enter. Fund*, 561 U.S. at 511. Heads of departments, by definition, must be appointed as principal officers. *Freytag*, 501 U.S. at 884.

72.    Despite the requirement that they be appointed as principal officers, the putative Council members were not appointed through presidential nomination and Senate confirmation. The putative Council members therefore exercise their powers unconstitutionally.

*Unlawful Inferior Officers—Appointment by Constitutionally Ineligible Persons*

73.    Even if Council members need only be appointed as inferior officers, such appointment has not taken place.

74.    The default appointment procedure for inferior officers is presidential appointment with Senate confirmation. *Edmond*, 520 U.S. at 660.

75.    The Constitution permits Congress to loosen this requirement only within strict limits: Congress may only vest the appointment of inferior officers in the President, the courts of law, or the heads of departments; and Congress must do so "by Law." U.S. Const. art. II, § 2, cl. 2.

76.    Congress has not vested the appointment of Council members in the President, a court of law, or a head of department. Nor were they appointed thereby. Accordingly, even if Council members need only be appointed as inferior officers, the putative members still exercise their powers unconstitutionally.

*Unlawful Issuance of the Final Rule*

77.     Amendment 56 and its implementing regulation were adopted by the 17 individuals who claim to be members of the Council but who were not appointed to that body pursuant to the Appointments Clause. The actions of these 17 individuals acting as Council members are therefore void. Because the Final Rule was issued under provisions of the Magnuson-Stevens Act that require the Gulf Council to have first validly adopted an amendment and implementing regulation before the Secretary (or her delegate) may promulgate a regulation, the promulgation of the Final Rule was "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," "without observance of procedure required by law," and "contrary to constitutional right [and] power." 5 U.S.C. § 706(2).

## COUNT II: The Executive Vesting Clause and Take Care Clause

***Issuance of a Rule by the National Marine Fisheries Service Not in Accordance with Law, Contrary to Constitutional Right and Power, in Excess of Statutory Jurisdiction, Authority, and Limitations, and Without Observance of Procedure Required by Law** (5 U.S.C. § 706(2))*

78.     The preceding paragraphs are incorporated herein by reference.

79.     For reasons discussed in the First Claim for Relief, Council members are officers of the United States.

80.     The Executive Vesting Clause, together with the Take Care Clause, requires that officers be removable by the President, so that he may oversee and thereby take responsibility for their actions.

81.     Only two types of officers may enjoy tenure protection. But the Council is neither (1) a "multimember body of experts, balanced along partisan lines, that

perform[] legislative and judicial functions and [is] said not to exercise any executive power," nor does it comprise (2) "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2199–2200. Thus, no Council member may have any sort of tenure protection; each must be removable at will. Their tenure protections violate the Executive Vesting Clause and the Take Care Clause.

82.    Even if Council members were permitted to enjoy tenure protections, the tenure protections here are so stringent as to impede the President's oversight and therefore violate the Executive Vesting Clause and the Take Care Clause.

83.    The five state officials are not removable at all by the President or another officer of the United States, which arrangement violates the Executive Vesting Clause and the Take Care Clause.

84.    The eleven Council members nominated by the governors may be removed by the Secretary through only one of two methods: (1) if two-thirds of the Council agrees, or (2) if these members violate certain financial conflict-of-interest provisions. 16 U.S.C. § 1852(b)(6)(A)–(B).

85.    The first removal method creates more than one layer of tenure protection, because to remove a Council member, the Secretary must first gain the assent of other Council members, who are similarly protected. In fact, this removal method creates interminable layers of tenure protection because the protection is recursive: to remove a Council member, the Secretary must gain the assent of other Council members, none of whom can be removed without the assent of other Council

members, none of whom can be removed without the assent of other Council members, and so forth and so on. The result is that just over one-third of the Council, if united, can frustrate all attempts of removal under this pathway. This level of protection prevents the President from holding the Council to account and therefore does not satisfy the Executive Vesting Clause and the Take Care Clause.

86.    The second removal method is not a removal provision that permits the President to take care that the laws be faithfully executed, because it is not substantially related to the performance of Council members' duties. Removal provisions do not satisfy the Executive Vesting Clause and the Take Care Clause simply by technically permitting removal in narrow circumstances. *See Free Enter. Fund*, 561 U.S. at 503 (noting that some removal standards may "be inappropriate for officers wielding the executive power of the United States").

> The President must be able to remove . . . officers who disobey his commands [and] also those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political party who is dead set against the President's agenda, and those in whom he has simply lost confidence.

*Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) (cleaned up).

87.    What's more, the second removal method would not permit removal even of a member who flagrantly abuses his power, engages in nepotism, or engages in criminal malfeasance while in office, so long as he scrupulously divulges his financial interests and recuses himself from appropriate Council decisions. For example, so long as members avoid financial conflicts of interests, they may openly violate every regulation-created rule that purports to govern their conduct, *see* 50 C.F.R. § 600.225

(prohibiting abusing one's office to interfere with an election, restricting lobbying activities, forbidding adverse action against Council employees based on political affiliation or activity, and prohibiting criminal and dishonest conduct), yet successfully resist removal. The second pathway to removal therefore does not satisfy the Executive Vesting Clause and the Take Care Clause.

88.    For the foregoing reasons, 16 of the 17 Council members' removal protections violate the Executive Vesting Clause and the Take Care Clause because the President is not capable of overseeing the Council's agenda or actions.

*Unlawful Issuance of the Final Rule*

89.    Amendment 56 and its implementing regulation were adopted by the 17 individuals who claim to exercise executive power as members of the Council but whose tenure protections violate the Executive Vesting Clause and the Take Care Clause. The actions of these 17 individuals acting as Council members are therefore void. Because the Final Rule was issued under provisions of the Magnuson-Stevens Act that require the Gulf Council to have first validly adopted an amendment and implementing regulation before the Secretary (or her delegate) may promulgate a regulation, the promulgation of the Final Rule was "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," "without observance of procedure required by law," and "contrary to constitutional right [and] power." 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs request the following relief:

1.     A judgment declaring that the Final Rule is void because the 17 individuals purporting to be Council members were not appointed pursuant to the Appointments Clause and could not validly adopt Amendment 56 or its implementing regulation, and that, without a validly adopted Council measure, the Secretary and NMFS lacked the power to promulgate the Final Rule;

2.     A judgment declaring that the Final Rule is void because the 17 individuals purporting to be Council members have tenure protections that unconstitutionally insulate them from Presidential removal under the Executive Vesting Clause and Take Care Clause and therefore, they could not validly adopt Amendment 56 or its implementing regulation, and without a validly adopted Council measure, the Secretary and NMFS lacked the power to promulgate the Final Rule;

3.     A permanent prohibitory injunction setting aside the Final Rule and forbidding Defendants from enforcing it;

4.     An award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, or any other applicable authority; and

5.     An award of any further relief that this Court deems just and proper.


Dated: June 9, 2024.

Respectfully submitted,

*/s/ Michael Poon*
MICHAEL POON*

PACIFIC LEGAL FOUNDATION
555 Capitol Mall
Suite 1290
Sacramento, CA 95814
Tel.: (916) 419-7111
MPoon@pacificlegal.org
* *Pro hac vice pending*

*Attorney for Plaintiffs*