# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| DOMINICK RUSSO; JAMES RUSSO; FFC SEAFOOD, INC., | Civil Action No. 1:24-cv-00186-WS-M |
| Plaintiffs, | |
| v. | |
| GINA RAIMONDO, in her official capacity as Secretary of the United States Department of Commerce; JANET COIT, in her official capacity as Assistant Administrator for Fisheries; and NATIONAL MARINE FISHERIES SERVICE, | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 2

LEGAL BACKGROUND ................................................................................................ 3

    I.    The Magnuson-Stevens Act and the Gulf of Mexico Fishery
           Management Council ........................................................................................ 3

    II.   Amendment 56 and the Rule .......................................................................... 5

ARGUMENT ................................................................................................................... 6

    I.    Plaintiffs have standing ................................................................................. 6

    II.   The Secretary's rulemaking power under the Magnuson-Stevens Act
          is conditioned on the Council validly adopting an FMP or amendment
          and regulations ............................................................................................... 7

    III. Council members must be appointed under the Appointments Clause ............ 7

          A.  The Appointments Clause prescribes the constitutional method for
              appointing Officers of the United States ................................................ 8

          B.  The Council members serve in continuing positions ............................. 10

          C.  An officer exercises significant federal authority if the officer exercises
              significant discretion in carrying out important functions ..................... 11

          D.  The Council exercises significant authority ........................................... 13

              1. The Council's two-step rulemaking powers are significant .................. 13

              2. The Council's powers outside the two-step rulemaking
                 process are significant ...................................................................... 19

    IV. The putative Council members were not appointed pursuant
          to the Appointments Clause ........................................................................... 21

          A.  The putative Council members were not properly appointed
              as principal officers ................................................................................ 21

              1. Under *Edmond*, Council members are principal officers and were
                 not properly appointed as such. ....................................................... 22

              2. Under *Arthrex*, Council members are principal officers and were
                 not properly appointed as such. ....................................................... 24

           B.  The putative Council members were not properly appointed
              as inferior officers either ........................................................................ 25

           C.  The Secretary's rulemaking lacked the key statutory prerequisite; therefore,
              the rule is unlawful, and must be vacated ............................................. 26

V.  Council members' insulation from Presidential removal violates
    Article II's Vesting and Take Care Clauses ................................................. 29

    A.  Council members fall within neither exception to the President's
        removal power ...................................................................................... 30

    B.  The Act's removal restrictions are unconstitutional even if the Council
        may enjoy some removal protections ................................................. 31

    C.  The removal protections require the Rule's vacatur ................................ 33

CONCLUSION ........................................................................................................ 34

CERTIFICATE OF SERVICE ................................................................................. 36

## INTRODUCTION

The Framers designed Article II as a unity. The executive power—all of it—is vested in the President. This unity ensures accountability to the people. All power must be exercised, directly or indirectly, by the People's elected representative. Article II guarantees "Energy in the Executive," an "essential" characteristic of good government for "the protection of the community against foreign attacks . . .[ ] the steady administration of the laws, [ ] the protection of property . . .[ ] justice; [and] [ ] the security of liberty . . . ." The Federalist No. 70 (Alexander Hamilton). The unity of the executive is protected by the Appointments Clause and by the President's power to remove executive officers. When executive officials circumvent this unity, government accountability to the people and individual freedom suffers.

Plaintiffs James and Dominick Russo are commercial fishermen. They fish for gag grouper off the Florida coast. In June 2023, the Gulf of Mexico Fishery Management Council voted to enact Amendment 56 along with a proposed implementing rule, seeking to restrict the amount of gag grouper fishermen can catch each season. The National Marine Fisheries Service ("NMFS") implemented Amendment 56 and its accompanying regulation by final rule on June 1, 2024, imposing an approximately 85% decrease in the commercial catch limit for gag grouper. 89 Fed. Reg. 40,419 (May 10, 2024) ("Final Rule").

The Council is established by the Magnuson-Stevens Fishery Conservation and Management Act. 16 U.S.C. §§ 1801–1891d (the "Magnuson-Stevens Act" or "Act"). It is an independent policymaking body that manages fisheries in a region of federal waters. The Council has 17 voting members, but all are unconstitutionally appointed.

Without constitutionally appointed officers, the Council's vote on Amendment 56 and its implementing rule were unlawful and NMFS lacked the authority to enact the Final Rule.

1

Officers of the United States must be appointed in accord with the Appointments Clause. Council members are officers because they wield significant, and often unreviewable, power to make fishery policy for the Gulf Coast region. But Council members are a mish-mash of gubernatorial nominees, state officeholders, and a career federal civil servant, none of which satisfy the Appointments Clause. The Council's actions in enacting Amendment 56 and its implementing rule are therefore void, and NMFS should have rejected the measures as unlawful or declined to act on them. Instead, it unlawfully approved both measures and promulgated the Rule.

The Rule is also invalid because the Council members are improperly insulated from presidential removal. Article II vests the President with the power to remove his officers at will, yet Council members enjoy extraordinarily strong removal protections. Council members' removal protections render their offices unconstitutionally structured and their adoption of Amendment 56 and the Rule unlawful. Thus, as with the appointment defect, NMFS lacked authority to enact the implementing rule.

Because NMFS lacked the authority to promulgate the Rule, the Court should set it aside.[1]

## FACTUAL BACKGROUND

James and Dominick Russo are fishermen who own and operate FFC Seafood, a commercial fishing business located in Sarasota, Florida. Declaration of Dominick Russo ¶ 3; Declaration of James Russo ¶ 3 (collectively, "Declarations"). They run two commercial fishing boats and possess the vessel, gear, and permit necessary to fish for gag grouper. Declarations ¶ 4.

---

[1] Due to the complexity of the statute and importance of the constitutional issues, Plaintiffs respectfully request that the Court hold a hearing after briefing concludes. *See* § 1855(f)(4); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 72 (D.D.C. 2007) ("If the party challenging the Secretary's action so requests, the court is obliged to hold a hearing . . . .").

They work in fisheries managed by the Council. Declarations ¶ 2. They have fished for gag grouper in the past, are fishing for gag grouper this year, and plan to fish for gag grouper in the future. Declarations ¶ 5.

But the Gulf of Mexico Fishery Management Council adopted Amendment 56 and the Rule that implements the Amendment, proposing significant quota reductions on gag grouper. Declarations ¶ 7. And NMFS promulgated the Final Rule. Declarations ¶ 8. Amendment 56 and the Rule lowered the total gag grouper catch limit, cutting Plaintiffs' catch for gag grouper by approximately 85%. *Id.* Plaintiffs would fish for more gag grouper than the allotted quota this year and in the future but for the Final Rule's quota reduction. Declarations ¶¶ 13–18.

## LEGAL BACKGROUND

### I. The Magnuson-Stevens Act and the Gulf of Mexico Fishery Management Council

The United States regulates ocean fisheries from the state seaward boundary to 200 nautical miles offshore. *See* 43 U.S.C. § 1312; 16 U.S.C. § 1856(a)(1). Federal fisheries are regulated principally through the Magnuson-Stevens Act. 16 U.S.C. §§ 1801–1891d.

The Act creates eight regional Councils as independent bodies within the Executive Branch that set fisheries policy for federal waters. § 1852(a). The Councils are charged with preparing fishery management plans ("FMPs") and FMP amendments, § 1852(h)(1), consistent with ten National Standards, *see* § 1851(a).

The Act protects each Council's policymaking power. It expressly states that any guidelines developed by the Secretary regarding National Standards "shall not have the force and effect of law." § 1851(b). Thus, Councils are limited only by the National Standards and applicable law. And Councils propose regulations to implement FMPs and amendments. § 1853(c). The Act created the Gulf of Mexico Fishery Management Council ("The Council") and gave it "authority

3

over the fisheries in the Gulf of Mexico seaward of" Texas, Louisiana, Mississippi, Alabama, and Florida. § 1852(a)(1)(E).

The Council has 17 seats. Five seats are filled by the five respective governors with each state's "principal State official with marine fishery management responsibility." § 1852(b0(1)(A). One seat is taken by "[t]he regional director of the National Marine Fisheries Service" for the Gulf of Mexico, the Southeast Regional Administrator. § 1852(b)(1)(B). The Southeast Regional Administrator is a career employee in the Senior Executive Service (SES). AR11584–85. The regional director and the governor designees can fill their seats with their own designees. § 1852(b)(1)(A)–(B). Five of these seats on the Council were filled by further designees at the time the Council voted on Amendment 56. AR012007; 012010; 012014; 012017; 012019.

For the final eleven seats, the five state governors nominate at least three individuals for each vacancy. The Secretary must make her selection for these vacancies from these nominees, unless one does not satisfy statutory qualifications. In that case, the Secretary must await a qualified slate of nominees from the governor and make her selection therefrom. § 1852(b)(2)(C). She cannot select her own qualified appointee.

The Act creates a two-step rulemaking procedure. First, the Council adopts a fishery management plan ("FMP") or an amendment to such a plan. § 1854(a)(1). The measure is reviewed by the Secretary of Commerce for consistency with statutory factors and "other applicable law." § 1854(a)(1)(A). If the plan or amendment is lawful, the Secretary must approve it; if she fails to act within 30 days, the measure "take[s] effect as if approved." § 1854(a)(3).

Second, the Council adopts a regulation to implement the plan or amendment. § 1854(b)(1). Again, the Secretary reviews the regulation for lawfulness and, if it is lawful, must approve and promulgate it. *Id.*

The Secretary has delegated her authority under the Act to the Administrator of the National Oceanic and Atmospheric Administration ("NOAA"). AR011558–011561. The NOAA Administrator has in turn delegated that authority to the Assistant Administrator for Fisheries, who leads the National Marine Fisheries Service ("NMFS"), a component agency of NOAA. AR011571. Accordingly, the Assistant Administrator for Fisheries conducts the secretarial review under the Act's two-step rulemaking process. *Cf.* § 1854(a)–(b).

## II.    Amendment 56 and the Rule

In June 2023, fourteen of the fifteen present putative Council members initiated the two-step rulemaking by approving Amendment 56. AR005302. The putative Council members also approved a rule implementing Amendment 56, AR10168, which NMFS approved as lawful, AR11423; AR11429.

In the meantime, the Council requested NMFS implement interim measures to reduce gag grouper stock acceptable catch limit ("ACL") from 3.12 million pounds to 661,901 pounds for 2023. AR002005–002027. NMFS implemented interim measures through a temporary rule effective on May 3, 2023. 88 Fed. Reg. 27,701 (May 3, 2023).

On April 26, 2024, the Assistant Administrator for Fisheries approved Amendment 56, AR011423, and the approval was memorialized in a decision memorandum, AR11425–29. On May 10, 2024, NMFS published the Final Rule implementing Amendment 56. *Id.* Amendment 56 and the Rule reduced the commercial catch limit for gag grouper by approximately 85%. *Id.*

Originally, the total acceptable catch limit was 3,120,000 lbs. and the commercial allocation was 39%, coming out to 1,217,000 lbs. 88 Fed. Reg. at 27,707; 89 Fed. Reg. at 40,420. During the interim period, the total acceptable catch limit was 661,901 lbs. and the commercial allocation remained at 39%, coming out to 258,000 lbs. 88 Fed. Reg. at 27,702. After Amendment

56 and the Rule went into effect, the total acceptable catch limit was cut to 444,000 lbs. and the commercial allocation was set to 35%, coming out to 155,000 lbs. 89 Fed. Reg. at 40,421.

Commercial fishing for gag grouper is managed under an individual fishing quota ("IFQ"). 89 Fed. Reg. at 40,419. That means that individuals hold shares of the commercial fishing quota, such that the commercial quota is distributed amongst those holding IFQ shares, proportionate to the shares they hold. Thus, when the commercial catch limit is reduced, commercial fishermen's individual quotas are reduced in proportion.

## ARGUMENT

### I.    Plaintiffs have standing

Amendment 56 and the Rule injure Dominick and James by reducing the amount of gag grouper they can catch each season. The elements of standing are (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Dominick and James are commercial fishermen who fish for gag grouper. The Rule's reallocations injure the fishermen by reducing the amount of gag grouper they can catch and thereby reducing their income. *See generally* Declarations ¶¶ 8–27. That injury is traceable to the Defendants' promulgation of the Rule. *See* 89 Fed. Reg. 40,419. And the injury is redressable because the Court must vacate the Rule if, as the Plaintiffs allege, Defendants lacked authority to issue the Rule. 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706. Thus, standing is satisfied. *See Lofstad v. Raimondo,* 117 F.4th 493, 497–98 (3d Cir. 2024) (holding that fishermen had standing to challenge improper appointment of Council members).

## II. The Secretary's rulemaking power under the Magnuson-Stevens Act is conditioned on the Council validly adopting an FMP or amendment and regulation

NMFS issued the Rule under 16 U.S.C. § 1854(b). *See* 88 Fed. Reg. at 39,198 (discussing "section 304(b)(3) of the Magnuson-Stevens Act"). That provision conditions the Secretary's (and so NMFS's) rulemaking power on satisfying a statutory prerequisite: for the Secretary to promulgate a regulation, it must have first been validly adopted by the Council. Furthermore, the regulation must be supported by an FMP or FMP amendment validly adopted by the Council. *See* 16 U.S.C. § 1854(b) (allowing promulgation of a regulation adopted by the Council under 16 U.S.C. § 1853(c)); § 1853(c) (empowering Council to adopt regulations to implement an FMP or FMP amendment). In the absence of a valid, Council-adopted regulation and FMP or FMP amendment, § 1854(b) does not allow the Secretary to issue any rules. In such circumstances, the Secretary's rulemaking power is restricted to conditions and procedures not followed here. *See, e.g.*, § 1854(c).[2]

As explained below, the Council members were not validly appointed and therefore Amendment 56 and the Rule were not and could not be validly adopted by the Council.

## III. Council members must be appointed under the Appointments Clause

Gulf Council members must be constitutionally appointed but they were not. They make fishery policy for an entire region subject only to a limited lawfulness review by a secretarial proxy. The Council's adoption of Amendment 56 and its implementing rule was unlawful; therefore, NMFS could not legally issue the implementing rule.

---

[2] Moreover, the government cannot now rely on the Secretary's unilateral rulemaking power, as it was not invoked when the Rule was promulgated. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20–22 (2020).

### A. The Appointments Clause prescribes the constitutional method for appointing Officers of the United States

The President of the United States is vested with the Executive Power and the obligation to take care that the laws be faithfully executed. Art. II, §§ 1, 3. To do so, he relies on subordinate officers for assistance. *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021). The Appointments Clause governs the selection of these subordinate officers. The Clause provides

> [The President] shall have Power [to] nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art II, § 2, cl. 2.

Thus, from the apex of the people's elected President on down, subordinate officers exercise power through "a clear and effective chain of command." *Arthrex,* 594 U.S. at 11–12 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010)). James Madison extolled this "great principle of unity and responsibility in the Executive department," which ensures that "the chain of dependence [will] be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Arthrex*, 594 U.S. at 11 (citing 1 Annals of Cong. 499 (1789)). The Founders designed the Appointments Clause in this manner as a "reaction to 'one of [their] generation's greatest grievances against [pre-Revolutionary] executive power,' the manipulation of appointments." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. 448, 457 (2020) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991)).

On guard against manipulation, the Framers concentrated and dispersed the power of appointment. First, they concentrated the appointment power in the hands of a single President.

*Edmond v. United States*, 520 U.S. 651, 659 (1997). Second, they dispersed the power, requiring advice and consent by the Senate. *NLRB v. SW General, Inc.*, 580 U.S. 288, 293–94 (2017). These twin columns ensure those who exercise the power of appointment remain accountable to the people. The President must bear the weight of a bad nomination, the Senate, for rejecting a good one. *Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 590 U.S. at 457; *see also* Federalist No. 77 (Alexander Hamilton) ("The blame of a bad nomination would fall upon the President singly and absolutely. The censure of rejecting a good one would lie entirely at the door of the Senate[.]"). In short, the Appointment's Clause guarantees officer accountability to the President and ultimately to the people.

The Appointments Clause applies only to "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. Anyone who wields "significant" federal power is an officer of the United States and must "be appointed in the manner prescribed by [the Appointments Clause]." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). An officer exercises significant authority if "in the course of carrying out . . . important functions, [the official] exercise[s] significant discretion." *Lucia v. SEC*, 585 U.S. 237, 247 (2018) (internal quotation marks omitted). Among those that the Supreme Court has determined to be officers are not only heads of agencies but also postmasters first class, district court clerks, and election supervisors. *Buckley,* 424 U.S. at 126; *Edmond*, 520 U.S. at 661 (discussing *Ex parte Siebold,* 100 U.S. 371 (1879)).

Officers are subdivided into principal and inferior officers. Principal and inferior officers are differentiated by whether the officer "is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663. The inquiry is "how much power an officer exercises free from control by a superior." *Arthrex*, 594 U.S. at 17. Inferior officers are those who are adequately controlled by a

Senate-confirmed officer. *Free Enter. Fund*, 561 U.S. at 510 (citing *Edmond*, 520 U.S. at 662–663). All other officers are principal officers. *Arthrex*, 594 U.S. at 12. Principal offices may be filled only by Presidential nomination and Senate confirmation. That is also the default method for filling inferior offices. *Edmond*, 520 U.S. at 660. But if Congress provides "by Law," the appointment of an inferior office may be vested in the President, a head of department, or a court of law. *Id.*

When an individual's selection does not conform to the Appointments Clause, his "appointment . . . to office is deficient," and he acts only "under the color of official title." *Ryder v. United States*, 515 U.S. 177, 180 (1995). An unconstitutional appointment provision "is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment)." *Collins v. Yellen*, 594 U.S. 220, 259 (2021). With the provision displaced, the appointments are invalid, and those officers "lack[] the authority to carry out the functions of the office." *Id.* at 258. Therefore, their actions are "void" as actions of their putative offices. *Id.* at 257.

### B. The Council members serve in continuing positions

A position must be "continuing" to qualify as an office and trigger application of the Appointments Clause. *See Lucia*, 585 U.S. at 245. Council seats are continuing. They are "created by statute, down to [their] duties, salary, and means of appointment." *Id.* at 248 (simplified); *see* § 1852(d) (setting compensation). They are permanent positions; no law provides for the sunset or other termination of these Council positions. § 1852(a)(1) ("There shall be established" the Council positions). Their duties are also continuing, in that a Council is responsible at all times for managing fisheries in its geographical jurisdiction. § 1852(a)(1)(E).

### C. An officer exercises significant federal authority if the officer exercises significant discretion in carrying out important functions

An officer is an official with significant federal authority. *Lucia*, 585 U.S. at 245–46. For an official to possess significant authority, it is sufficient that "in the course of carrying out . . . important functions, the [official] exercise[s] significant discretion." *Id.* at 247 (simplified).

The Supreme Court defined significant authority in *Freytag v. Commissioner*, which held that the Tax Court's Special Trial Judges ("STJs") exercise significant authority and must be appointed as officers. Tax cases are assigned to Tax Court Judges who may be assisted by STJs. *See Freytag*, 501 U.S. at 870–71. STJs are empowered to preside over two categories of cases. In one category of cases, STJs can "not only [ ] hear and report on a case but also [ ] decide it." *Id.* at 873. In the second category of cases, called (b)(4) cases, STJs can "only [ ] hear the case and prepare proposed findings and an opinion." *Id.* In (b)(4) cases, STJs "could not issue the final decision." *Lucia*, 585 U.S. at 246 (describing *Freytag*); *Freytag*, 501 U.S. at 873–74. But they "prepar[ed] the proposed findings and opinion" for a Tax Court Judge, who then ruled on the case. *Freytag*, 501 U.S. at 880. An STJ's "opinion counts for nothing unless the regular judge adopts it as his own." *Lucia*, 585 U.S. at 249. Even so, they could "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Freytag*, 501 U.S. at 881–82. It followed that STJs exercised "significant discretion" in carrying out these "important functions," and thus STJs possessed significant authority and required appointment as officers. *Id.* at 882.

The Court followed *Freytag* in *Lucia*. The Court held that SEC administrative law judges ("ALJs") exercise significant authority. ALJs have the same powers as STJs to preside over cases and "critically shape the administrative record." *Lucia*, 585 U.S. at 248. But ALJs have more significant authority than STJs. Whereas STJ's (b)(4) decisions must be reviewed by a Tax Court

Judge, "the SEC can decide against reviewing an ALJ decision at all," rendering an ALJ decision the final action of the Commission. *See id.* at 249 (quoting 17 C.F.R. § 201.360). The Court thus held that SEC ALJs must be appointed as officers.

And *Buckley v. Valeo* demonstrated that significant authority is not a particularly high bar. In establishing the significant-authority requirement, the Court reaffirmed past decisions that even postmasters first class and district court clerks must be appointed as officers. The Court stated that "[i]f a postmaster first class and the clerk of a district court are . . . officers of the United States within the meaning of the Appointments Clause, *as they are*, surely the [FEC] Commissioners before us are" officers as well. 424 U.S. 1, 126 (1976) (citations omitted and emphasis added). In other words, an officer holds significant authority if his authority is greater than a postmaster first class or a district court clerk.

Foreshadowing *Freytag*'s (b)(4) analysis, *Buckley* held that even the FEC's power to issue advisory opinions is a significant power because that power does not "operate[ ] merely in aid of congressional authority to legislate" and is not "sufficiently removed from the administration and enforcement of public law." *Id.* at 141. Indeed, the Court characterized officers as all officials "exercising responsibility under the public laws of the Nation." *Id.* at 131.

As these cases demonstrate, courts examine the full scope of an official's authority, not just the powers exercised in a particular case, to determine the official's officer status. If an official possesses any significant powers, even ones not exercised with respect to the challenged action, the official is an officer for all assigned duties and is subject to the Constitution's constraints. That's because "it ma[kes] no sense to classify [officials] as officers for some cases and employees for others." *Lucia*, 585 U.S. at 247 n.4. "If a[n] [official] is an . . . officer for purposes of [some of

his duties], he is an . . . officer within the meaning of the Appointments Clause and he must be properly appointed." *Freytag*, 501 U.S. at 882.

### D. The Council exercises significant authority

The Council not only exercises significant discretion in carrying out important functions, but it also has the final, unreviewable word across a range of issues.

The Council's powers fall into two categories: its powers within the two-step rulemaking process, and its powers outside that process.

### 1. The Council's two-step rulemaking powers are significant

The Council exercises significant powers within the two-step rulemaking process. First, the Council has exclusive policymaking power over Gulf fisheries in federal waters. Second, the Council decides when the rulemaking process starts; NMFS cannot act until the Council initiates the process. Third, Council decisions have independent, final effect. Fourth, the Council assembles the record for fishery policies and their lawfulness review by the Secretary or her delegate. This constellation of powers vested in and exercised by the Council unquestionably amounts to significant authority.

*First*, the Council has exclusive policymaking power over Gulf of Mexico fisheries in federal waters. The Council has power to set federal fisheries policy. As NMFS's top regulatory official, Deputy Assistant Administrator for Regulatory Programs Sam Rauch, stated, the Council "is basically a mini legislative body" that decides "who, when, and where people get to fish." Ruth Sando, *Rauch, Sam ~ Oral History Interview*, Voices from the Fisheries, NMFS, NOAA, 15, 19, (June 30, 2016), https://voices.nmfs.noaa.gov/sites/default/files/2018-09/rauch_samuel.pdf.

13

("Rauch").[3] The Council exercises this power through fishery management plans and plan amendments, in which Council members decide "the conservation and management measures" to be employed in the fishery, the amount of fishing permitted, the kinds of permits and fees required, the triggers for fishery closures, and much more. §§ 1852(h)(1); 1853(a)–(b).

If the Council's policy is lawful, it becomes law. After adopting an FMP or amendment, the Council submits the measure to NMFS, which reviews it for consistency with law. § 1854(a). NMFS must approve any Council FMP or amendment that does not violate the law. § 1854(a)(1), (3). If NMFS disapproves a measure, it must explain how the measure conflicts with law. § 1854(a)(3). NMFS cannot reject an FMP or amendment on policy grounds. In addition, if NMFS fails to act on an FMP or amendment within an allotted time, "then such plan or amendment shall take effect as if approved." *Id.* Thus, Council members "can bind the Executive Branch and have some 'last-word' authority." *Arnesen v. Raimondo*, No. 1:23-cv-145-TBM-RPM & No. 1:23-cv-160-TBM-RPM, 2024 WL 377820, at *13 (S.D. Miss. Jan. 31, 2024) (citing *Lucia*, 585 U.S. at 249).

The Council also possesses power to propose any regulation it "deems necessary or appropriate" to implement an FMP. § 1853(c). But again, any proposal that is lawful becomes law and if the proposed regulation is unlawful, NMFS must return it to the Council for revision. *See* § 1854(b).

The Council exercises significant authority in promulgating FMPs, FMP amendments, and proposed regulations. In doing so, Council members set policy, including whether to restrict and even permanently close fisheries. These policies inflict a high impact on the livelihoods of

---

[3] This interview is not part of the Administrative Record and is cited, not as evidence of a factual claim, but as one would cite a law review article: for its legal conclusion and apt wording.

fishermen and their communities. The Council's power is much broader, more discretionary, and more coercive than that of the *Freytag* and *Lucia* adjudicators. Those adjudicators took evidence and proposed resolutions to discrete cases affecting a handful of parties. The Council's policies affect all fishermen in an entire region. If the adjudicators in *Freytag* and *Lucia* are officers, "as they are, surely" Council members are officers too. *Buckley*, 424 U.S. at 126.

The Secretary, through NMFS, can block FMPs, amendments, and proposed regulations only for a conflict with "applicable law," § 1854(a)(1)(A), (b)(1), so the Council has the final, unreviewable power to choose from the lawful policy options and cast them into law. NMFS merely verifies that a measure is lawful before it goes out the door. § 1854(a)(3), (b). As Mr. Rauch put it, NMFS "ultimately issue[s] the regulations . . . because it resolves what [the Councils] do as legal," but "they really drive the system." *Rauch*, *supra*, at 15. "[NMFS] basically are the auditors of that system." *Id.* Section 1854 empowers the Council to call the shots within the wide range of lawful policy choices. And, according to the Supreme Court, when an executive official is not checked by another "on matters of law *as well as* policy," the official is a *principal* officer, as discussed later—and so necessarily an officer. *Arthrex*, 594 U.S. at 18 (emphasis added).

The Council need not take the final step of promulgating the regulation to have significant authority. *Freytag* is analogous. There, STJs could do everything a judicial officer could do, including recommending a final decision, but the STJ could not render the final decision because it was subject to review by the Tax Judge. Here, the Council can do everything to make policy including adopting an FMP, amendment, or regulation, but the Council does not issue the final

rule because it is subject to NMFS review. STJs exercised substantial authority and had to be appointed. So too must Council members.[4]

*Second*, if NMFS would like to pass a policy, it must obtain the Council's agreement, because the two-step rulemaking process requires both the Council and NMFS to approve a policy for it to become effective. § 1854(a)–(b).[5] As a result, the Council can thwart NMFS's policy preferences. And unlike NMFS's power to block Council actions, the Council may refuse to adopt NMFS's preferred fisheries measures on policy grounds, not just for unlawfulness. Furthermore, NMFS must wait for the Council to begin the process by "transmit[ting] . . . a fishery management plan or plan amendment" or "proposed regulations" to NMFS. § 1854(a)(1), (b)(1). Thus, the Council has significant discretion in performing the important function of crafting FMPs, amendments, and regulations in the first instance—and whether to allow NMFS's preferred measures. §§ 1852(h)(1), 1853(c). And having significant discretion in performing important functions is all it means to have significant authority. *Lucia*, 585 U.S. at 238.

*Third*, the Council's decisions—both in adopting FMPs and amendments and in adopting regulations—have independent effect.

The Council writes FMPs and amendments, while NMFS can only approve or disapprove such a measure. § 1854(a)(3). If NMFS decides not to block an FMP or amendment, it is the Council's action that becomes effective as written. The Council is thus like the ALJ in *Lucia*. The ALJ's decision "bec[ame] final and [ ] deemed the action of the Commission" if the SEC

---

[4] And the Council's power is even more significant than the STJs because, as explained below, the Council's FMPs and amendments can become final even without NMFS approval. *Supra* at p. 17.

[5] NMFS's unilateral rulemaking powers are usually limited to instances where a Council fails to act, so they do not come into play so long as the Council actively takes part in rulemaking. § 1854(c).

"decline[d] review (and issue[d] an order saying so)." *Lucia*, 585 U.S. at 249 (simplified). Like the Council, the ALJ's decisions could have "independent effect." *Id.* at 248–49.

In fact, the Council's actions have an even more independent effect than the ALJ's decisions. *Id.* at 249–50. An ALJ decision required SEC to enter an order effectively adopting the decision to give it final effect. The Council's FMP or amendment becomes final by default if the Secretary simply fails to act on it. § 1854(a)(3).

When the Council's FMPs go into effect, including by default, they have a significant impact on the balance of federal and state power. Section 1856(a)(3)(A) permits states to regulate their fishermen only if there is no applicable FMP or if a state's regulations are consistent with an applicable FMP and regulations. This effect occurs as soon as an FMP or amendment goes into effect; the effect is not dependent on the promulgation of an implementing regulation.

The Council's power to propose regulations has a similar independent effect. The Council proposes regulations in the first instance. If NMFS approves a regulation, it is promulgated and becomes final, creating the same "independent effect" as a *Lucia* ALJ decision when the SEC declined review. Although NMFS may revise proposed regulations within 30 days after the notice-and-comment period, § 1854(b)(3), revisions must be limited, because an implementing regulation must be consistent with an FMP or FMP amendment. *See* § 1854(b)(1); 1853(c). And FMPs and amendments are typically highly detailed and leave little room for alteration. Here, for example, Amendment 56 itself specified all of the quota reductions and reallocations that injure Plaintiffs. *See* AR10167–68 (memorandum from Council to NMFS summarizing Amendment 56); AR10169–10425 (formal Amendment 56).

Moreover, NMFS can only revise a regulation if it first "consult[s] with the Council." *See* § 1854(b)(3). In the absence of consultation within 30 days, NMFS "shall" issue the regulation as

17

a final rule. *Id.* And the Council can deny consultation for that 30-day period and force the Secretary to publish the rule as is. *See Oceana, Inc. v. Ross*, No. 17-cv-5146, Docket No. 124, at 8–9 (C.D. Cal. Nov. 18, 2019) (government brief) ("NMFS has repeatedly attempted to consult with the Pacific Council," but "NMFS lacks the authority to *compel* the independent Pacific Council to place this item on its agenda or deliberate further on this subject."). In 2020, a Council did just that and forced NMFS to promulgate a regulation over the agency's objections. *See* 85 Fed. Reg. 7246, 7247 (Feb. 7, 2020) (stating that NMFS published the rule because it was not able to consult with the Council in time, such that NMFS was unable to withdraw or revise the rule).

*Fourth*, the Council assembles the record. Even in the absence of the Council's independent policy-making power, the Council still wields significant authority because it shapes the administrative record on which any final decision must be based. *Cf. Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corp of Eng'rs*, 722 F. Supp. 2d 535, 542 (D. Del. 2010) (An administrative record consists of the materials that were "directly or indirectly considered" by an agency taking an action. (simplified)); *accord Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

In *Freytag*, an STJ's recommendatory decision still amounted to significant authority because it shaped the administrative record on which a final decision would be based. *See Lucia*, 585 U.S. at 248–49; *Freytag*, 501 U.S. at 874. Like STJs, the Council critically shapes the administrative record for proposed fishery measures. When adopting an FMP or amendment, the Magnuson-Stevens Act requires the Council to specify every relevant detail, including "the number of vessels" in the fishery, "the type and quantity of fishing gear used," the type of fish at issue, "the present and probable future condition of . . . the fishery," the likely costs of management measures, those measures' "cumulative conservation, economic, and social impacts," relevant

18

"economic information," the presence of essential fish habitat, the "scientific data which is needed for effective implementation of the plan," and numerous other types of information. § 1853(a). The Council also shapes the record by collecting comments from the public, § 1852(h)(3), and reports from its various advisory committees and panels, § 1852(g)(1)–(3). Under *Freytag*, this is significant authority requiring appointment as officers.

### 2. The Council's powers outside the two-step rulemaking process are significant

The discussion above concerns only the Council's powers within the two-step rulemaking process of § 1854(a)–(b). The Council's powers outside that process are also significant. Indeed, they empower the Council to supervise and control the Secretary. *See generally Lofstad*, 117 F.4th at 499.

*First*, the Council may block the Secretary's attempt to "repeal or revoke a fishery management plan for a fishery under the authority of a Council." § 1854(h). Even if the Secretary invokes her power under § 1854(c), she cannot revoke an FMP unless a three-quarters supermajority of the Council grants permission. § 1854(h). Thus, a small minority of the Council can block the action—and for any reason, not just illegality. *Id.* The Council exercises significant discretion in carrying out this important power. And its decision is unreviewable.

As discussed above, whether to revoke an FMP is a significant authority with important impacts on federalism. The Act provides that states may manage fisheries in federal waters if "there is no fishery management plan or other applicable Federal fishing regulations for the fishery in which the vessel is operating." § 1856(a)(3)(A)(i). Otherwise, state regulations are subject to the applicable FMP and regulations. § 1856(a)(3)(A)(ii). Thus, a Secretary seeking to return regulatory policy to the states must seek the Council's permission, giving the Council control over the balance of power between the states and the federal government.

19

*Second*, the Council may block the Secretary's attempt to delegate management to a state. Under § 1856(a)(3)(B), the Secretary may do so "only if the Council approves the delegation . . . by a three-quarters majority." Again, the Secretary is placed in the position of seeking the Council's permission to act, which permission the Council may deny on any ground. And when a state's delegated management efforts are inconsistent with the FMP, the delegation is suspended until the Secretary *and* the Council "find that the State has corrected the inconsistencies." § 1856(a)(3)(B).

*Third*, "the Secretary may not . . . establish[ ] a limited access system . . . unless such system is first approved by a majority of the voting members" of the relevant Council. § 1854(c)(3). If the Secretary invokes her power to establish a limited access system, the Council can block the Secretary's action on policy grounds. The Council's decision is unreviewable. *Id.* That is significant discretion over an important function.

*Fourth*, the Act empowers the Council to compel the Secretary to issue regulations. "[T]he Secretary *shall* promulgate emergency regulations or interim measures . . . if the Council, by unanimous vote of the . . . voting members," "finds that an emergency exists or that interim measures are needed to reduce overfishing." § 1855(c)(2)(A) (emphasis added). The Council's decision cannot be reviewed. This places every member of the Council—including the Secretary's nominal subordinate, the NMFS Regional Administrator—in a position of commanding the Secretary's action. The Secretary's mandatory compliance with the Council's directive under § 1855(c)(2)(A) is underscored by the next subparagraph, which provides that "the Secretary *may* promulgate emergency regulations" if the Council's emergency determination is not unanimous. § 1855(c)(2)(B) (emphasis added).

*Fifth*, the Council has many other powers outside of the Magnuson-Stevens Act. For example, it may compel the Secretary to collect certain information under the Marine Mammal Protection Act. § 1383a(e)(4). It may forbid the Secretary from approving certain fishing permits and force her to require permit conditions crafted by the Council. Pub. L. 104-43, 109 Stat. 366, Title VII § 802 (Nov. 3, 1995). And it may make rules subject to secretarial approval under § 773c(c).

\*    \*    \*

Each of these powers alone constitutes significant authority, being an important function over which the Council exercises significant discretion. The combination of powers is, beyond question, significant authority.

## IV. The putative Council members were not appointed pursuant to the Appointments Clause

As officers, Council members may be appointed only under the Appointments Clause. But the Council's members were not properly appointed even though they are responsible for Amendment 56 and its implementing regulation. They lacked the constitutional authority to adopt the amendment and regulation. Both must be vacated. *Ryder*, 515 U.S. at 180; *Collins*, 594 U.S. at 258–60.

### A. The putative Council members were not properly appointed as principal officers

The Council's authority and independence render its members principal officers. But no putative member was nominated by the President and confirmed by the Senate. Therefore, they were not properly appointed. They lack the Council's power.

Principal officers are officers who do not qualify as inferior. *Arthrex*, 594 U.S. at 12. The inquiry is "how much power an officer exercises free from control by a superior." *Id.* at 17. "[T]he

21

governing test" from *Edmond* for direction and supervision turns on three factors: whether a Senate-confirmed official (1) exercises "administrative oversight" over the officer, (2) may remove the officer without cause, and (3) "could review the [officer's] decisions" before they become final. *Id.* at 13–14, 16–18 Importantly, *Arthrex* held that if an officer has "the 'power to render a final decision on behalf of the United States' without any . . . review by [a] principal officer in the Executive Branch," then the officer is necessarily a principal officer. *Id.* at 14.

Under both tests, Council members are principal officers.

### 1. Under *Edmond*, Council members are principal officers and were not properly appointed as such

All three *Edmond* factors demonstrate that Council members are principal officers. First, the Council is not subject to administrative oversight. Second, Council members are not removable at will by a Senate-confirmed officer. Third, the Council's policy decisions are not subject to review by others in the Executive Branch.

First, the Council is not subject to administrative oversight. By statute, the Council sets its own priorities, establishes and directs its own staff, and creates its own operating procedures. § 1852(e)–(i). No official controls what FMPs, FMP amendments, or implementing regulations the Council adopts. In fact, the Magnuson-Stevens Act prohibits interference by the Secretary, allowing her only to "assist" in the formulation of FMPs by "establish[ing] advisory guidelines" that explicitly "shall not have the force and effect of law." § 1851(b). This is a far cry from qualifying administrative oversight. *See Arthrex*, 594 U.S. at 13–14 (noting examples of administrative oversight include "prescribing rules of procedure and formulating policies" to control officers and deciding when adjudicators may hear a case, which adjudicators will hear a case, and which past decisions bind future adjudicators). And no official controls in any way the Council's significant powers outside the two-step rulemaking process.

Second, no Council member is removable at will by a Senate-confirmed officer. The five governor-designated members cannot be removed by the Secretary at all. § 1852(b)(1)(A). The Regional Administrator is a career SES employee, AR11584–85, and so cannot be removed except for cause, see 5 U.S.C. §§ 7541–43. The eleven governor-nominated members are removable by the Secretary only "for cause" and only if two-thirds of the Council first seek removal of that member or if the member violates certain financial conflict-of-interest provisions. § 1852(b)(6)(A)–(B).

Third, the Council's decisions cannot be countermanded by others in the Executive Branch. If the Council's policy is lawful, the Secretary must approve and promulgate it. This is like *Arthrex*. There, the Patent and Trademark Office Director had to "take final action to cancel a patent claim or confirm it" after the Administrative Patent Judge ("APJ") issued a decision, but the substantive final power to decide cases still resided with the APJ. 594 U.S. at 15. The APJ was a principal officer; so too are the Council members.

The Secretary also does not actually conduct the § 1854(a)–(b) review. Appointments Clause supervision is not decided on formalities. *See Arthrex*, 594 U.S. at 18 (An officer's formal rank or technically greater responsibilities is irrelevant.). The Assistant Administrator reviewed Amendment 56 and the Rule for lawfulness, not the Secretary. AR011423. This is the agency's standard operating procedure. *See, e.g.*, 89 Fed. Reg. 28,679, 28,680 (Apr. 19, 2024) ("Pursuant to [§1854(b)], the NMFS Assistant Administrator has determined that this final rule is consistent with . . . applicable law."); 89 Fed. Reg. 25,820, 25,821 (Apr. 12, 2024) (same); 89 Fed. Reg. 19,760, 19,761–62 (Mar. 20, 2024) (same); 89 Fed. Reg. 15,062, 15,063 (Mar. 1, 2024) (same); 89 Fed. Reg. 9072, 9073 (Feb. 9, 2024) (same). The Assistant Administrator is not Senate-

confirmed. Reorganization Plan No. 4 of 1970 § 2(e)(1). Thus, no Senate-confirmed officer conducts even the minimal review provided by the Act.

Principal-officer review is even more starkly absent from the Council's exercise of its other significant powers. The Secretary cannot overrule the Council if it vetoes the Secretary's actions under § 1854(h) and (c)(3), § 1856(a)(3)(B), and 109 Stat. 366, Title VII § 802, or if the Council forces the issuance of a regulation under § 1855(c)(2)(A) or the compulsory collection of information under § 1383a(e)(4). Those Council actions are final. In fact, it is the Council which supervises and controls the Secretary.

The Council is not supervised or directed by a Senate-confirmed official. Thus, Council members must be appointed as principal officers under *Edmond*.

### 2. Under *Arthrex*, Council members are principal officers and were not properly appointed as such

Council members also must be appointed as principal officers under *Arthrex*. As discussed above, they have the final word with regard to emergency regulations, limited-access systems, repeals of FMPs, state regulatory powers over fisheries, the collection of certain information under the Marine Mammal Protection Act, and the approval and conditions of certain permits. *See* §§ 1854(a)–(b), (h), (c)(3), 1855(c)(2)(A), 1856(a)(3)(B), 1383a(e)(4); Pub. L. 104-43, 109 Stat. 366, Title VII § 802. Each of these powers is therefore a "principal-officer power." *Arthrex*, 594 U.S. at 17; *Lofstad*, 117 F.4th at 501 (holding council members are principal officers). The Council members must be properly appointed to exercise them.

Additionally, they have the final word on policy under the two-step rulemaking procedure, especially for policy concerns outside the National Standards. This is also a principal-officer power, and the Council members must be properly appointed to exercise it. *See Arthrex*, 594 U.S. at 18 (inferior officers must be "directed . . . on matters of law as well as policy").

*    *    *

Council members are principal officers. Their seats must be filled by Presidential nomination and Senate confirmation. The seventeen putative Council members here were not so appointed. They never exercised lawful authority, and their adoptions of Amendment 56 and its implementing rule were void.

### B. The putative Council members were not properly appointed as inferior officers either

Council members are principal officers. But even if they were inferior officers, they would still not be properly appointed. For inferior officers, Congress can authorize appointment by the President alone, a head of department, or a court of law. *See* Art. II, § 2, cl. 2.

The Magnuson-Stevens Act provides that five seats are to be designated by governors or by the governors' designees. § 1852(b)(1)(A). And the regional administrator is a career SES official hired by a lesser official within the Department of Commerce, not by the Secretary of Commerce. AR11583. These eight individuals were improperly appointed.

But the eleven governor-nominated individuals are also not properly appointed as inferior officers. Though they are nominally selected by the Secretary, who is a head of department, the Secretary's choice is restricted to governors' nominees. § 1852(b)(2)(C). And governors may nominate as few as "three individuals for each applicable vacancy." *Id.* Critically, the Act forbids the Secretary from rejecting a nominations list for a vacancy unless one of the nominees fails to satisfy objective statutory qualifications. *Id.* The Secretary may not reject a nominations list because of the individuals' character, policy prescriptions, or likely faithfulness in executing the law. *Compare with Collins*, 594 U.S. at 256 (The President must be able to exclude from his officers "those who have different views of policy," "those who come from a competing political party," and those he determines are "not intelligent or wise." (simplified)). If the Secretary

25

determines that a nominee is not qualified, she must wait for the governor to amend his nominations; she cannot pick her own appointees. § 1852(b)(2)(C). Thus, any eventual appointee must be a governor nominee.

Such a nomination-and-confirmation procedure splits the appointment power between the nominator and confirmer, *see* U.S. Const. art. II, § 2, cl. 2 (regarding appointment by Presidential nomination and Senate confirmation), so the Act's procedure gives a share of the appointment power to governors in violation of the text of the Appointment's Clause. Worse, as the government itself argued in another case, the Secretary's ability to influence a Council's position "is limited because the governors control the pool of available appointees." *Delta Com. Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 271 (5th Cir. 2004). And because the Secretary cannot reject nominees who "meet the qualifications," the governors have "the primary responsibility for" deciding "the composition of the interests represented by the Council." *Id.*, Br. for the Fed. Appellees, 2003 WL 23783211, at *23–*24. Governors, however, may hold no part of the appointment power under the Appointments Clause, so the eleven governor-nominated individuals were improperly appointed even if they may be appointed as inferior officers.

### C.  The Secretary's rulemaking lacked the key statutory prerequisite; therefore, the rule is unlawful, and must be vacated

Due to the Council's structural defects, the Council never validly adopted Amendment 56 or the Rule. The Appointments Clause provides the "exclusive means" of filling officer positions and officers that are not properly appointed act unlawfully. *Lucia*, 585 U.S. at 244. When an individual's selection does not conform to the Appointments Clause, his "appointment . . . to office is deficient," and he acts only "under the color of official title." *Ryder*, 515 U.S. at 180. This is because the statutory appointment provision, being "unconstitutional[,] . . . is never really part of the body of governing law (because the Constitution automatically displaces any conflicting

statutory provision from the moment of the provision's enactment)." *Collins*, 594 U.S. at 259. The result is that those individuals were not appointed to the office and "lack[] the authority to carry out the functions of the office." *Id.* at 258.

The putative Council members were not properly appointed and so did not exercise lawful authority. Therefore, the Council never presented NMFS with a valid amendment or regulation. NMFS was thus obligated not to act on the measures submitted by the putative Council members or, at most, it was obligated to formally reject them as unlawful. That is because without a validly adopted FMP amendment and regulation from the Council, NMFS lacked the power under statute to issue the Rule. *See* § 1854(b); 5 U.S.C. § 706(2)(A), (C), (D). The promulgation was also contrary to constitutional right, in its assumption that the putative Council members validly held Council seats, *see* § 706(2)(B), thereby violating both Plaintiffs' individual constitutional rights to be governed by accountably appointed policymakers and the structural imperative of the separation of powers. *Cf. Bond v. United States*, 564 U.S. 211, 222 (2011) ("The structural principles secured by the separation of powers protect the individual as well."); *see also Cirko v. Comm'r*, 948 F.3d 148, 153 (2020) (citing *Glidden Co. v. Zdanok*, 370 U.S. 530, 536–37 (1962)). Plaintiffs are therefore entitled to having the Rule and Amendment 56 "set aside." § 1855(f)(1)(B); 5 U.S.C. § 706(2).

Furthermore, even if some Council seats complied with constitutional requirements, if any Council member is unconstitutionally appointed, then the Council is still improperly constituted, with all the results noted above. The Court may not assume that members serving constitutionally would have approved Amendment 56 and its implementing regulation in the absence of the unconstitutional putative members. In *Free Enterprise Fund*, a firm being investigated by the Public Company Accounting Oversight Board challenged Board members' appointments. 561

U.S. at 511–12. The firm argued that Board members' appointments as inferior officers by the full Securities and Exchange Commission were invalid because the Chairman, not the full Commission, was the head of department. *Id.* The government responded that that was irrelevant, as the Chairman had voted with the other Commissioners to appoint the Board members. *Id.* at 512 n.12. The Court, however, rejected the government's argument because "[w]e cannot assume . . . that the Chairman would have made the same appointments acting alone[.]" *Id.*

Likewise, the Court may not assume that constitutionally serving Council members would have adopted Amendment 56 and the implementing regulation "acting alone" and without the influence of the unconstitutional, putative members. *Free Enter. Fund*, 561 U.S. at 512 n.12. As the Court made clear in *Seila Law*, separation-of-powers plaintiffs are "not required to prove that the Government's course of conduct would have been different in a counterfactual world in which the Government had acted with constitutional authority." 591 U.S. 197, 211 (2020) (simplified).

Indeed, as the D.C. Circuit held in *FEC v. NRA Pol. Victory Fund*, courts cannot assume that members—even *nonvoting* members—of a multimember body "ha[d] no *actual* influence on agency decisionmaking" and so were "constitutionally harmless." 6 F.3d 821, 822, 826 (D.C. Cir. 1993), *as amended* (Oct. 25, 1993). Rather, the presumption is the opposite: because members of multimember bodies are there "to exercise *some* influence," courts must presume their presence "ha[s] some impact (even though the extent of which may be impossible to measure)." *Id.* at 825, 826. This follows from the doctrine of structural violations under which violations of structural protections are *per se* harmful and require reversal without a harmless-error analysis. *See Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993). As the D.C. Circuit has held, the structural-error doctrine applies to "[i]ssues of separation of powers (including Appointments Clause matters)," because "it will often be difficult or impossible for someone subject to a wrongly designed scheme

to show that the design—the structure—played a causal role in his loss." *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000).

Thus, the Court should vacate the Rule and Amendment 56 even if only one Council member was improperly appointed. If, however, the Court finds that 9 or more Council seats were unconstitutionally filled, the Council lacked a quorum to adopt Amendment 56 or its implementing regulation, § 1852(e)(1), and the Rule should be vacated for that reason as well.

## V.    Council members' insulation from Presidential removal violates Article II's Vesting and Take Care Clauses

The Executive Vesting Clause, together with the Take Care Clause, grants the President the power to remove officers. Every official "who exercise[s] significant authority" must be "subject to" that "control." *Free Enter. Fund*, 561 U.S. at 506. The Constitution thus ensures that "[e]very individual, in the long chain which extends from the highest to the lowest link of the Executive Magistracy," is politically accountable through presidential removal—a power inherent in "that great principle of unity and responsibility in the executive department." 1 Annals of Cong. 515–16, 518 (June 17, 1789) (remarks of Rep. Madison). Only those with "limited duties" and "no policymaking or administrative authority," *Seila Law*, 591 U.S. at 218, may enjoy even "modest" protections, *see Collins*, 594 U.S. at 225. The Framers designed Article II in this fashion to guard against the great "danger to liberty" that lay in "the difficulty of displacing" entrenched executive officials. 1 Annals of Cong. 515 (1789) (Rep. Madison).

Accordingly, the Constitution's default rule is that the President must be able to remove officers at will. *Seila Law*, 591 U.S. at 202–205. There are two narrow exceptions to this general rule. First, for a "multimember body of experts, balanced along partisan lines, that perform[] legislative and judicial functions and [is] said not to exercise any executive power." *Id.* at 216–17.

Second, for "inferior officers with limited duties and no policymaking or administrative authority." *Id.*

Even within those two categories, Congress cannot abrogate all presidential control. For instance, in limited circumstances, Article II may tolerate for-cause protections. *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 619 (1935). But when Congress imposes an extra layer of such protection, it impermissibly interferes with presidential control over the Executive Branch. *See Free Enter. Fund.*, 561 U.S. at 495–96. In short, certain tenure-protection schemes are inherently "inappropriate" for any official who is "wielding the executive power of the United States." *Id.* at 503.

### A. Council members fall within neither exception to the President's removal power

The Council members must be subject to Presidential removal. They fall within neither exception to the rule.

The first exception, recognized in *Humphrey's Executor*, requires that a multimember body be balanced along partisan lines and exercise no executive power. *See Selia Law*, 591 U.S. at 216–217. It applies only to "officers of the kind . . . under consideration" there. *Id.* at 215. Rulemaking is not a "legislative" function but an executive one; legislative functions consist of "making investigations and reports . . . for the information of Congress." *Humphrey's Executor*, 295 U.S. at 628; *Seila Law*, 591 U.S. at 215–16.

The Council members do not fit this exception. The Act lacks partisan-balance requirements. Its members exercise the executive function of rulemaking. They do not exercise the quasi-legislative functions of investigating or reporting to Congress and they do not exercise the quasi-judicial function of adjudicating disputes.

The second exception, recognized in *Morrison v. Olson*, 487 U.S. 654 (1988), reaches only "certain *inferior* officers with narrowly defined duties." *Seila Law*, 591 U.S. at 204. In *Morrison*, the Court upheld protections for the independent counsel—a prosecutor "appointed . . . to accomplish a single" criminal investigation. *Morrison*, 487 U.S. at 672 (1988). The independent counsel "lacked policymaking or administrative authority" because her power "was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter." *Seila Law*, 591 U.S. at 219.

Council members do not fit this exception. First, they are principal officers. *See supra*, at 22–25. Even if they were inferior, they would still be unlike the independent counsel. Council members exercise "policymaking . . . authority" that affects "private citizens and businesses" across the country. *Seila Law*, 591 U.S. at 219–20. Their extensive "duties" under the Act "are far from" the limited, time-bound, narrow-in-scope independent counsel.

Neither exception applies. Council members must be removable at will. None are, and most of the removal protections for Council members are near absolute. As the following section shows, the Council's removal protections violate Article II.

### B. The Act's removal restrictions are unconstitutional even if the Council may enjoy some removal protections

Even if an exception applied to permit Council members to enjoy removal protections, the Magnuson-Stevens Act's extraordinary and unprecedented removal protections are so strong as to be unconstitutional for 16 of the 17 members. As the Court has stated, some removal standards "may be inappropriate for officers wielding the executive power of the United States." *Free Enter. Fund*, 561 U.S. at 503.

First, the President cannot remove the Council's five state officials at all. These members serve "so long as" they occupy predicate state positions. 16 U.S.C. § 1852(b)(1)(A). No federal official can remove these five officers.

Second, the eleven Council members nominated by governors may be removed by the Secretary only through one of two methods: (1) if two thirds of the Council agree, or (2) if these members violate certain financial conflict-of-interests provisions. § 1852(b)(6)(A)–(B).

The first removal method creates more than one layer of tenure protection and is unconstitutional. To remove a Council member, the Secretary must first gain the assent of other Council members, who are similarly protected. This method creates interminable layers of tenure protection because it is recursive. The Secretary can only remove a Council member with the assent of other Council members, none of whom can be removed without the assent of other Council members, and so forth and so on. The result is that just over one third of the Council, if united, can frustrate removal. This level of protection prevents the President from holding officers accountable through removal.

The second removal method is too limited. Removal provisions do not satisfy Article II simply by allowing removal in a narrow circumstance. See *Free Enter. Fund*, 561 U.S. at 503 (noting that some removal standards may "be inappropriate for officers wielding the executive power of the United States"). Instead, the Supreme Court has found "[t]he President must be able to remove" all "officers who disobey his commands, those who he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political party who is dead set against the President's agenda," and any officer "in whom he has simply lost confidence." *Collins*, 594 U.S. at 256 (cleaned up).

What's more, the second removal method would not permit removal even if a member flagrantly abused his power, engaged in nepotism, or engaged in criminal malfeasance while in office, so long as he scrupulously divulges his financial interests and recuses himself from appropriate Council decisions. For example, so long as members avoid financial conflicts of interests, they may openly violate every regulation-created rule that purports to govern their conduct, *see* 50 C.F.R. § 600.225 (prohibiting abusing one's office to interfere with an election, restricting lobbying activities, forbidding adverse action against Council employees based on political affiliation or activity, and prohibiting criminal and dishonest conduct), yet successfully resist removal. The second pathway to removal therefore does not satisfy the Executive Vesting and Take Care Clauses.

### C.  The removal protections require the Rule's vacatur

The Act's unconstitutional removal protections cannot be severed from the Council members' powers. The governor designees have no tenure-protection provision to sever at all; their protection arises from the fact that the statute simply requires that they "shall be" on the Council. § 1852(b)(1). And the Regional Administrator's removal protections stem from his career civil-service protections arising from outside the Act, the severance of which would have significant repercussions across the civil service and would not have been preferred by Congress. *See Seila Law*, 591 U.S. at 234 (holding that severance may not create "legislation that Congress would not have enacted" (simplified)). Nor should the Court sever the governor nominees' removal protections; their strength and complexity indicate that Congress strongly preferred these members' independence in formulating fisheries policy.

Because the removal protections cannot be severed from these Council members' powers, their powers cannot be lawfully exercised. *See Free Enter. Fund*, 561 U.S. at 513 (holding that the

plaintiffs were "not entitled to broad injunctive relief" because the unconstitutional removal protection at issue could be severed); *Seila Law*, 591 U.S. at 232–33 (concluding that whether "the removal protection was severable" was "essential" to determining whether "the CFPB may continue to exist and operate").[6] Furthermore, as explained above in the discussion regarding *Free Enterprise Fund*, *NRA*, and the doctrine of structural violations, if even one seat's removal protections cannot be severed, the Council as a whole is improperly structured and the Rule must be vacated.

## CONCLUSION

For all these reasons, the Secretary lacked authority to adopt Amendment 56 and the Rule. Plaintiffs respectfully request that the Court vacate the Final Rule.

Dated: November 26, 2024.

Respectfully submitted,

*/s/ Adam Griffin*

ADAM GRIFFIN*
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
Tel.: (336) 202-0082
AGriffin@pacificlegal.org

MICHAEL POON*
PACIFIC LEGAL FOUNDATION

---

[6] *Collins* is not to the contrary. First, *Collins* indicated that a plaintiff seeking monetary "retrospective relief" must show "compensable harm" stemming from the officer's insulation from removal, but it did not cast doubt on the availability of a prospective injunction, vacatur, or declaratory relief. *See Collins*, 594 U.S. at 257, 259. Furthermore, *Collins*'s remedial analysis implicitly depended on the severability of the removal protection from the powers exercised. *See id.* at 258 n.23 (concluding that "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office").

555 Capitol Mall
Suite 1290
Sacramento, CA 95814
Tel.: (916) 419-7111
MPoon@pacificlegal.org
\* *Pro hac vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2024, I electronically filed the foregoing document with the Clerk using the CM/ECF system, which will send notice of such filing to counsel of record who are registered with CM/ECF.

*/s/ Adam Griffin*
ADAM GRIFFIN

*Attorney for Plaintiffs*