# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

DOMINICK RUSSO, *et al.*,

    *Plaintiffs*,

v.

GINA RAIMONDO, U.S. Secretary of Commerce, *et al.,*

    *Defendants*.

No.: 1-24-cv-00186-WS-M

## [PROPOSED] BRIEF OF *AMICI CURIAE*
## GULF OF MEXICO REEF FISH SHAREHOLDERS' ALLIANCE AND
## SEAFOOD HARVESTERS OF AMERICA

I. INTRODUCTION

Plaintiffs seek to dismantle the process by which ocean fisheries have been managed in this country for nearly 50 years. The relief Plaintiffs request would create massive uncertainty around how ocean fisheries are to be managed, subject numerous fish species to overfishing and depletion, disrupt commercial investment, and cause untold economic losses.

Such drastic outcomes are unwarranted because Plaintiffs concoct a constitutional issue where there is none. The regional fishery management councils ("Councils") established by the Magnuson-Stevens Fishery Conservation and Management Act ("Act") are advisory bodies. They do not set federal policy that the Secretary of Commerce, acting through the National Marine Fisheries Service ("NMFS"), is required to rubber stamp. The Act's plain language makes clear that members of the Councils are not "Officers of the United States" who must be appointed in accordance with the Appointments Clause or be subject to the President's removal powers. Plaintiffs are entitled to no relief whatsoever because their claims are meritless.

Even if the Court concludes that portions of the Act are somehow repugnant to the Constitution, the appropriate remedy is to sever those portions from the Act but otherwise leave the regulatory regime intact. Vacating the challenged action, as Plaintiffs request, is overbroad, and would harm the nation's fisheries and those like *Amici's* members who depend upon those resources for their livelihoods.

II. IDENTITY AND INTERESTS OF *AMICI CURIAE*

A. The Gulf of Mexico Reef Fish Shareholders' Alliance

The Gulf of Mexico Reef Fish Shareholders' Alliance ("Shareholders' Alliance") is the largest organization of commercial grouper and snapper fishermen in the Gulf of Mexico. *See* AR011115. The Shareholders' Alliance works to ensure that fisheries are sustainably managed so

its members' businesses can thrive and fishing communities can exist for future generations. *Id*. Its members provide much of the American public with a reliable source of domestically-caught wild Gulf seafood, harvested under a philosophy that sustainable seafood and profitable fishing businesses depend on healthy fish populations. *Id*. The mission of the Shareholders' Alliance is to unify and strengthen the reef fish fishing industry, and to achieve sustainability and accountability through the use of individual fishing quotas to manage the catch of reef fish species in the Gulf of Mexico. Members of the Shareholders' Alliance attend and testify at meetings of the Gulf of Mexico Fishery Management Council. They strive to conserve fish by reducing bycatch, protecting the marine environment, and improving accountability for all fishing sectors, while improving safety in the fishing industry and enhancing the economic value of fisheries in the Gulf of Mexico.

**B.      Seafood Harvesters of America**

Seafood Harvesters of America ("Harvesters") is the largest commercial fishing association in the United States. Harvesters represents commercial fishing interests across the country from Alaska and the West Coast to the Gulf of Mexico and New England. Its broad membership reflects the diversity of the nation's coastal communities, the complexity of its marine environments, and the enormous potential of the commercial fishing industry. Based in Washington, D.C., and founded by commercial fishermen and women in 2014, Harvesters serves as a unified, strong, and influential voice for the commercial fishing industry that works to advance the policies and regulations that promote sustainable fisheries. The Shareholders' Alliance is a member of Harvesters.

### III.      BACKGROUND

Defendants' brief aptly summarizes the legal and factual background. ECF No. 32 at 3-11. *Amici* elaborate on two issues relevant to their argument.

A.     **Commercial Sector IFQ Programs in the Gulf of Mexico**

Reef fish in the Gulf of Mexico include various species of jacks, snapper, grouper and tilefish. *See* 50 C.F.R. Part 622, Table 1, App. A. Commercial fishing for several of those species is managed under individual fishing quota ("IFQ") programs implemented under the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico ("Reef Fish FMP"). These programs allocated IFQ shares to eligible participants. IFQ shares are regulatory entitlements that authorize share holders to catch and sell specific quantities of fish from the Gulf of Mexico each year. *See* 16 U.S.C. §§ 1802(23), 1853a(b)(5)(c); 50 C.F.R. §§ 622.21, 622.22.

Amendment 26 to the Reef Fish FMP established an IFQ program for red snapper, while Amendment 29 established an IFQ program for grouper (including gag grouper, at issue here) and tilefish. *See Guindon v. Pritzker*, 31 F. Supp. 3d 169, 178-79 (D.D.C. 2014) (describing red snapper IFQ program); *Coastal Conservation Ass'n v. Locke*, No. 2:09-cv-641, 2011 WL 4530631, at *1 (M.D. Fla. Aug. 16, 2011) (report and recommendation describing grouper/tilefish IFQ program), *adopted sub nom. Coastal Conservation Ass'n v. Blank*, 2011 WL 4530544 (M.D. Fla. Sept. 29, 2011). NMFS approved both programs after being developed by the Gulf Council. *See* 71 Fed. Reg. 67447 (Nov. 22, 2006) (Final Rule implementing Amendment 26); 74 Fed. Reg. 44732 (Aug. 31, 2009) (Final Rule implementing Amendment 29). Federal regulations promulgated by NMFS govern these programs. 50 C.F.R. §§ 622.21, 622.22.

IFQ shares are transferable, and constitute valuable property rights. *See* 50 C.F.R. §§ 622.21(b)(6), 622.22(b)(6); *see also Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998) (for certain purposes, "[t]here can be no doubt that the IFQ permit is property."). The total value of the IFQ shares under these programs is estimated at over $450 million.[1]

---

[1] The median price for red snapper IFQ shares is approximately $45/pound. *See* NMFS, Gulf of Mexico Red Snapper Individual Fishing Quota Report (2022 update) at p. 34, available at https://noaa-

B.      Amendment 56 to the Reef Fish FMP

The primary impetus for Amendment 56 was NMFS's scientific finding that gag grouper are overfished, and that overfishing is still occurring. *See* 89 Fed. Reg. 40419, 40420 (May 10, 2024); AR011540; AR010190—010191.  In other words, the stock is depleted, and fish are being removed faster than the stock can replenish itself.  *See* 16 U.S.C. § 1802(38).  These findings triggered statutory requirements to end overfishing and rebuild the stock.  *See id*. §§ 1854(e)(3)(A), 1851(a)(1), 1853(a)(1)(A).

Amendment 56 thus reduced the annual catch limits for gag grouper primarily to end overfishing and rebuild the stock.  *See* AR010198.  Retaining the prior catch limits would have violated the Act's requirements.  *See* AR010201 ("Alternative 1"—i.e., status quo—"is not considered viable because it would not end overfishing, and would allow harvest in excess of that projected to allow the stock to rebuild under any of the rebuilding timelines allowed under the Magnuson-Stevens Act.").

Amendment 56 also included a reallocation of the catch limit, transferring a portion from the commercial sector to the recreational sector.  *See* AR010199 (describing "Preferred Alternative 3" of Action 2 that would "[r]evise the sector allocation to 65% recreational, 35% commercial"). This further reduced the catch limit for the commercial sector.  *Compare* AR010199 *with* AR010200. Through comment letters and public testimony, the Shareholders' Alliance opposed the reallocation component of Amendment 56, but supported the catch limit reductions needed to end overfishing and rebuild the stock.  *See* AR011115—011116; AR010159; AR010164.

---

sero.s3.amazonaws.com/drop-files/cs/2022_RS_AnnualReport_Final.pdf   In 2024, the commercial sector quota for red snapper was 8,318,100 pounds.  50 C.F.R. § 622.39(a)(1)(i).  The estimated total value of red snapper IFQ shares is thus approximately $374 million.  Valuing grouper/tilefish IFQ shares is more complex but, based on similar sources, is estimated to be approximately $80 million.  *See* NMFS, Gulf of Mexico Grouper/Tilefish Individual Fishing Quota Annual Report (2023 update) at p. 66 (IFQ share values), *available at* https://noaa-sero.s3.amazonaws.com/drop-files/cs/2023_GT_AnnualReport_FINAL.pdf; *see also* 50 C.F.R. § 622.39(a)(1)(i) (setting annual quotas for deepwater grouper, shallow water grouper, gag grouper, red grouper, and tilefish).

## IV.  ARGUMENT

Plaintiffs' arguments lack merit and the Court should dismiss this case. If, however, the Court concludes that portions of the Act conflict with constitutional requirements, the Court should impose a narrow remedy to limit harm to the nation's fisheries and those who depend upon them.

**A.  Councils Are Advisory Bodies Without Significant Authority**

On the merits, *Amici* agree with Defendants that the Councils established under the Magnuson-Stevens Act are merely advisory bodies that lack power to impose binding requirements on regulated parties. The Act plainly charges NMFS with that role. Plaintiffs' arguments to the contrary are based on flawed statutory interpretations that conflict with the Act's plain meaning and the canon of constitutional avoidance.

For the reasons stated in Defendants' brief, ECF No. 32 at 12-31 (Argument Section I), *Amici* urge the Court to reject Plaintiffs' arguments and dismiss this case.

**B.   Plaintiffs' Desired Remedy is Overbroad and Would Cause Widespread Harm**

Even if the Court agrees with Plaintiffs that select portions of the Magnuson-Stevens Act are somehow repugnant to the Constitution, Plaintiffs' requested relief is drastic and would harm our nation's fisheries and those like *Amici's* members who depend upon them. If any relief is necessary, *Amici* urge the Court to narrowly tailor the remedy by severing the offensive portions of the Act while leaving intact the remainder of the Act and the Final Rule implementing Amendment 56.

Plaintiffs ask the Court to vacate the Final Rule implementing Amendment 56 and the amendment itself. ECF No. 30 at 32. While this remedy may appear simple and straightforward, it would immediately create a host of problems.

Starting with gag grouper, vacating the catch limits implemented by the Final Rule would raise questions about what, if any, catch limits apply to the gag grouper fishery. But the purpose

of the Final Rule was "to implement a rebuilding plan for gag and revised management measures to end overfishing and rebuild the stock."  89 Fed. Reg. at 40419.  Plaintiffs do not dispute the purpose for the rule, only its authority.  Dispensing with catch limits altogether, or even returning to the catch limits prior to the Final Rule, would subject the stock to overfishing and depletion, an outcome that itself violates Congress's primary objectives in the Magnuson-Stevens Act.  *See* 16 U.S.C. §§ 1851(a)(1), 1853(a)(1)(A), 1853(a)(15), 1854(e)(3)(A); *see also* AR010201.

Looking beyond the gag grouper fishery, Plaintiffs' requested remedy would create massive uncertainty about existing regulations and how fisheries are to be managed going forward.  The requirements for science-based catch limits enacted by Congress in 2007[2] for numerous species of fish may effectively be nullified: if those limits were set through a process deemed unrectifiably unconstitutional, how would they be enforced?  A derby-style "race for fish" without enforcement or oversight may ensue that would deplete fish stocks and jeopardize human life at sea, all contrary to Congress's goals.  *See, e.g.*, 16 U.S.C. §§ 1801, 1851(a)(1), 1851(a)(10).

Uncertainty about catch limits would have cascading effects through fisheries and businesses like *Amici's* that depend upon those fisheries.  As described above, members of *Amici* hold valuable IFQ shares that authorize them to harvest gag grouper and other reef fish species.  But the value of these IFQ shares derives from certainty in future harvests and the durability of the management regime.  Vacating the Final Rule implementing Amendment 56 as the product of an unconstitutional process would call into question other regulations promulgated through the same process.  Appellants' remedy would thus devalue, or render useless, *Amici's* IFQ shares due to

---

[2] *See* 16 U.S.C. § 1853(a)(15); Pub. L. 109-479 (Jan. 12, 2007); S. Rep. 109-229 (Apr. 4, 2006) at 6 (finding that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan" and that failure to require "routine adherence" to catch limits "has contributed to continued overfishing."); *Conservation Legal Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (These 2007 statutory amendments "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps.").

management risk and uncertainty. That, in turn, would jeopardize *Amici's* business models and ability to supply fish to customers through the supply chains they have established due to the predictability of catches made possible by the IFQ programs. More broadly, depletion of fish stocks from overfishing would effectively end *Amici's* businesses, which is precisely why *Amici* supported the catch limit reductions in Amendment 56 as necessary to protect and rebuild the stock.

Fortunately, the Court can avoid these drastic outcomes by applying recent Supreme Court precedent. In resolving any constitutional flaws in a statute, the Supreme Court instructs courts to "'try to limit the solution to the problem' by disregarding the 'problematic portions while leaving the remainder intact.'" *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006)). When irreconcilable conflicts exist between the Constitution and a statute—as Plaintiffs assert here—courts must "give 'full effect' to the Constitution and to whatever portions of the statute are 'not repugnant' to the Constitution, effectively severing the unconstitutional portion of the statute." *Id*. (citation omitted). This limited-remedies principle is in accordance with the Supreme Court's "'normal rule that partial, rather than facial, invalidation is the required course.'" *Id*. (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

Accordingly, a tailored approach that severs only the allegedly unconstitutional provisions of the Magnuson-Stevens Act, but which gives full effect to the Act's remaining provisions, is the appropriate one. *Amici* therefore urge the Court to adopt Defendants' approach should it find that any remedy is warranted here. *See* ECF No. 32 at 31-33 (Argument Section II.A).

## V.   CONCLUSION

*Amici* respectfully urge the Court to dismiss Plaintiffs' claims or, if relief is deemed necessary, to narrowly tailor any remedy.

Dated:  January 17, 2025.

                Respectfully submitted,

                **K&L GATES LLP**

                */s/ J. Timothy Hobbs*
                J. Timothy Hobbs (*pro hac vice pending*)
                K&L Gates LLP
                501 Commerce Street, Suite 1500
                Nashville, TN 37203
                (615) 514-1811
                Tim.Hobbs@klgates.com

                *Attorneys for* Amici Curiae *Gulf of Mexico Reef Fish Shareholders' Alliance and Seafood Harvesters of America*