**FOR PUBLICATION**

# In the
# United States Court of Appeals
## For the Eleventh Circuit

---

No. 26-10171

---

DOMINICK RUSSO,
JAMES RUSSO,
FFC SEAFOOD, INC,

*Plaintiffs-Appellants-Cross Appellees,*

*versus*

SECRETARY, U.S. DEPARTMENT OF COMMERCE,
ASSISTANT ADMINISTRATOR OF THE NATIONAL MARINE FISHERIES SERVICE,
NATIONAL MARINE FISHERIES SERVICE,

*Defendants-Appellees-Cross Appellants.*

---

Appeals from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:24-cv-00186-JB-M

---

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This appeal concerns whether members of the Gulf of Mexico[1] Fishery Management Council are improperly appointed under the Appointments Clause. Congress created the Council under the Magnuson-Stevens Act to assist the Secretary of Commerce in managing our nation's fisheries. Some Councilmembers are members of state or federal government; others are appointed by the Secretary after being nominated by a state's governor. They are removable for cause. The Council's primary duty is to propose Fishery Management Plans, which are comprehensive frameworks for regulating fisheries, together with implementing regulations. To become effective, a regulation must be adopted and promulgated by the Secretary.

Dominick and James Russo, two commercial fishermen, challenged a rule promulgated by the Secretary through this two-step process. The rule reduced catch limits for gag grouper, a fish the Russos harvest. They contend that the Councilmembers are

---

[1] An executive order directs that "[t]he area formerly known as the Gulf of Mexico" be renamed as the "Gulf of America." Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025). Because the statutes pertinent to this appeal refer to the "Gulf of Mexico," 16 U.S.C. § 1852(a)(1)(E), we continue to use that name. *See Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*, 127 F.4th 1294, 1299 n.1 (11th Cir. 2025).

improperly appointed officers wielding significant federal authority in violation of the Appointments Clause. They also argue that the Councilmembers are unconstitutionally shielded from removal. They request that we vacate the gag grouper rule as a result.

The district court held that the Councilmembers are unconstitutionally appointed officers, citing three provisions of the Act that permit the Council to block secretarial action. The district court declined to vacate the rule, however, opting instead to sever these "veto" provisions and render the Councilmembers employees. Doc. 51 at 13-14. Although it did not undo the gag grouper rule, the district court entered judgment for the Russos.

We mostly agree with the district court's opinion. Like the district court and two other circuits to have addressed this issue, we conclude that the Act delegates significant authority to the Council, which it cannot wield as it is currently constituted. *See Arnesen v. Lutnick*, 170 F.4th 965, 975 (5th Cir. 2026); *Lofstad v. Raimondo*, 117 F.4th 493, 499 (3d Cir. 2024). But the remedy for this constitutional infirmity is not to void the Councilmembers' appointments or undo all the Council's actions. Instead, the remedy would be to declare invalid any action taken with the Council's unconstitutionally delegated executive authority. Because the gag grouper rule—the only executive action the Russos challenge as having affected them—was not based on the Council's unconstitutional authority, we will not vacate the rule as a remedy for the constitutional infirmity they have identified. Although the district court correctly denied the Russos relief, it entered judgment for the

Russos. We therefore remand for the district court to enter judgment for the government.

**I.**

We begin by summarizing the Council's mandate, appointment process, and powers. We then address the background of the gag grouper rule. We conclude with this appeal's procedural history.

*A.*

Congress passed the Magnuson-Stevens Act to "conserve and manage the fishery resources" of the United States. 16 U.S.C. § 1801(b)(1). The Secretary of Commerce is tasked with carrying out the Act. *Id.* § 1855(d). The Act created eight Regional Fishery Management Councils to "exercise sound judgment in the stewardship of fishery resources." *Id.* § 1801(b)(5); *see id.* § 1852(a)(1).

The Gulf of Mexico Fishery Management Council, at issue here, covers the States of Texas, Louisiana, Mississippi, Alabama, and Florida. *Id.* § 1852(a)(1)(E). The Council has seventeen voting members. *Id.* Five Councilmembers (one for each state) are the principal state officials tasked with fishery management and are appointed by the governor. *Id.* § 1852(b)(1)(A). The state official remains on the Council as long as he holds his position in state government. *Id.* One Councilmember is the regional director of the National Marine Fisheries Service and is not appointed by the President or Secretary. *Id.* § 1852(b)(1)(B). The NMFS is part of the De-

partment of Commerce. The eleven remaining members are appointed by the Secretary based on a list provided by the governor of each constituent state. *Id.* § 1852(b)(1)(C), (b)(2)(C). They may be removed if two-thirds of the Council recommend removal, or if the member has a financial conflict of interest. *Id.* §§ 1852(b)(6)(A)-(B), 1857(1)(O).

The Council's primary duty is to develop Fishery Management Plans and, as relevant here, prepare amendments to FMPs when a fishery requires conservation and management. *Id.* § 1852(h)(1). FMPs contain "conservation and management measures" necessary to prevent overfishing and ensure sustainability. *Id.* § 1853(a)(1). They include a wide variety of information: annual catch limits, measures to limit bycatch, criteria for assessing the condition of a fishery, scientific data and reports, a description of the fishery, and so on. *Id.* § 1853(a). The Council must also prepare regulations necessary to implement the FMP amendment. *Id.* § 1853(c).

After the Council drafts an FMP amendment and an implementing regulation, it must transmit them to the Secretary for review. The Secretary (or his designee, *see id.* § 1802(39)) then solicits public comments on the FMP amendment and reviews it "to determine whether it is consistent with the national standards, the other provisions of this chapter, and any other applicable law." *Id.* § 1854(a)(1)(A)-(B). The national standards are a list of ten principles provided by the Act. They require conservation and manage-

ment measures to, among other things, balance the need to prevent overfishing with the need to ensure an "optimum yield," be "based upon the best scientific information available," be efficient, minimize costs, minimize bycatch, and promote safety. *Id.* § 1851(a)(1)-(10). The Secretary must also consider "information, views, and comments" received during notice and comment. *Id.* § 1854(a)(2)(A).

The Secretary must approve, disapprove, or partially approve an FMP amendment within thirty days of the end of notice and comment. *Id.* § 1854(a)(3). A notice of disapproval or partial approval "shall specify" the applicable law with which the FMP amendment is inconsistent, the nature of the inconsistency, and recommendations for how to "conform such . . . amendment to the requirements of applicable law." *Id.* § 1854(a)(3)(A)-(C). The Council may submit a revised FMP amendment, restarting the process. *Id.* § 1854(a)(4). If the Secretary fails to notify the Council of his approval, disapproval, or partial approval, the FMP amendment "shall take effect as if approved." *Id.* § 1854(a)(3).

The Secretary also must review the Council's proposed implementing regulations. The Secretary must determine whether the regulation is consistent with the Council's FMP amendment, as well as "applicable law." *Id.* § 1854(b)(1). If the Secretary approves the rule, he must publish it for notice and comment. *Id.* § 1854(b)(1)(A). Before promulgating the final rule, the Secretary may revise it if he first "consult[s]" with the Council. *Id.* § 1854(b)(3). If he disapproves, he "shall notify" the Council of how

it is inconsistent with the FMP amendment or applicable law. *Id.* § 1854(b)(1)(B). Unlike with FMP amendments, a regulation can take effect only with the Secretary's approval.

Under certain circumstances, the Secretary has the power to make his own FMP amendments and regulations. Under 16 U.S.C. § 1854(c), if the Council fails to develop an FMP amendment after a "reasonable period of time," or if the Secretary disapproves the FMP amendment and the Council fails to submit a revision, the Secretary may prepare his own. The Secretary must submit his FMP amendment to the Council and consider its views before finalizing the amendment and implementing regulations. *Id.* § 1854(c)(4)-(6). Similarly, the Secretary may notify the Council that a fishery is overfished, in which case the Council has two years to submit an FMP, an FMP amendment, or proposed regulations. *Id.* § 1854(e)(1)-(4). If the Council does not do so within two years, the Secretary may do it himself. *Id.* § 1854(e)(5).

The Secretary may also implement temporary emergency regulations if he "finds that an emergency exists or that interim measures are needed to reduce overfishing." *Id.* § 1855(c)(1). The Council also has the power to force the Secretary to implement emergency regulations through a unanimous vote. *Id.* § 1855(c)(2)(A). Any request for emergency measures made by less than a unanimous vote is precatory. *Id.* § 1855(c)(2)(B). Emergency regulations that change an existing FMP may remain in effect for no more than approximately one year. *Id.* § 1855(c)(3)(B).

The Council has the power to block the Secretary from taking certain actions (the so-called "veto" power). First, the Secretary may repeal an FMP only if the Council approves the repeal by a three-fourths majority vote. *Id.* § 1854(h). Second, when the Secretary prepares an FMP amendment under section 1854(c), he cannot include a "limited access system" unless it is first approved by a majority of the Council. *Id.* § 1854(c)(3). A limited access system "limits participation in a fishery to those satisfying certain eligibility criteria." *Id.* § 1802(27). Third, the Secretary may delegate management of certain fisheries to a state only if the Council approves the delegation by a three-fourths vote. *Id.* § 1856(a)(3)(B). None of these powers were used to promulgate the gag grouper rule.

Finally, the Act permits judicial review of "[r]egulations promulgated by the Secretary" and actions taken under implementing regulations. *Id.* § 1855(f). Regulations are subject to judicial review in accordance with the Administrative Procedure Act, except that they may be "set aside" only if they are arbitrary and capricious, procedurally improper, in excess of statutory authority, or "contrary to constitutional right, power, privilege, or immunity." *Id.* § 1855(f)(1)(B); 5 U.S.C. § 706(2)(A)-(D).

*B.*

Gag grouper is a fish that lives in the Gulf of Mexico. In 2022, the Secretary informed the Council that gag grouper was being overfished, thus triggering the Council's two-year FMP drafting period. 16 U.S.C. § 1854(e)(3). The following year, the Council drafted Amendment 56 to the Fishery Management Plan for the

Reef Fish Resources of the Gulf of Mexico. Amendment 56 reduced catch limits for gag grouper to replenish the stock. The Council passed Amendment 56 by a vote of fourteen to one (two Councilmembers were absent).

While Amendment 56 was pending approval by the Secretary, the Council requested, and the Secretary implemented, a temporary rule reducing catch levels. Temporary Measures to Reduce Overfishing of Gag, 88 Fed. Reg. 7388 (proposed Feb. 3, 2023) (to be codified at 50 C.F.R. pt. 622); 88 Fed. Reg. 27701 (May 3, 2023) (to be codified at 50 C.F.R. pt. 622) (final temporary rule); 16 U.S.C. § 1855(c)(1). The Secretary approved a one-time extension of the final temporary rule later that year. Temporary Measures to Reduce Overfishing of Gag, 88 Fed. Reg. 69553 (Oct. 6, 2023) (to be codified at 50 C.F.R. pt. 622); 16 U.S.C. § 1855(c)(3)(B). The Council then submitted, and the Secretary published, a proposed rule implementing Amendment 56. Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Amendment 56, 88 Fed. Reg. 77246 (proposed Nov. 9, 2023) (to be codified at 50 C.F.R. pt. 622).

Following the notice and comment period, the Secretary approved Amendment 56 in early 2024, within the two-year deadline. The Council submitted, and the Secretary approved, the unchanged final rule shortly thereafter. The final rule cut annual catch limits by around eighty-six percent. *See* Amendment 56, 89 Fed. Reg. 40419, 40421 (May 10, 2024) (to be codified at 50 C.F.R. pt. 622).

*C.*

Dominick and James Russo are commercial fishermen who jointly own FFC Seafood, a family business. They have fished in the Gulf of Mexico for about thirty years. Gag grouper is their most profitable catch. According to their complaint, they have fished for gag grouper in the past, currently fish for gag grouper, and intend to fish for gag grouper in the future. Were they not prohibited from doing so, they would exceed the current catch limits. The Russos allege that they have "incurred significant financial losses" due to the rule's catch restrictions.

The Russos timely challenged the final rule under section 1855(f)(1). They brought two claims. First, they alleged that the Councilmembers are unlawfully appointed principal officers in violation of the Appointments Clause. They argued that the veto provisions, in addition to other parts of the Act, gave the Council significant authority. Second, they argued that the Act's removal restrictions violate the Vesting and Take Care Clauses. They requested a judgment declaring the rule void, as well as a permanent injunction against its enforcement.

The Russos moved, and the government cross-moved, for summary judgment. The district court granted in part and denied in part the Russos' motion and denied the government's motion in full. First, the district court concluded that the Russos have standing to sue because they suffered an injury traceable to the Secretary's promulgation of the rule. Second, the district court reasoned that the "veto" powers under sections 1854(c)(3), 1854(h), and

1856(a)(3)(B) grant the Council significant authority, making the Councilmembers officers. The district court concluded that these were the Council's only significant powers. The district court then held that, because none of the Councilmembers were appointed by the President and confirmed by the Senate, their appointments violated the Appointments Clause. Third, the district court held that the appropriate remedy was to sever the three veto provisions and leave the rest of the Act intact. It rejected vacatur, however, as "unnecessarily broad and severe." Doc. 51 at 13. Because severance "addresse[d] all [the] bases of [the] Plaintiffs' claims," the district court did not address the Vesting and Take Care Clauses arguments. *Id.* at 12 n.3.

The Russos and the government cross appealed.

**II.**

We review summary judgment decisions *de novo*. *Chappell v. Chao*, 388 F.3d 1373, 1376 (11th Cir. 2004). We also review constitutional questions *de novo*. *United States v. Castillo*, 899 F.3d 1208, 1212 (11th Cir. 2018).

**III.**

There are three issues to address. First, whether the Russos have standing. Second, whether the Council wields significant authority. Third, if the Council wields significant authority, whether we should vacate the gag grouper rule even though the Council's significant powers did not impact the rule's development or promulgation. We address each issue in turn.

*A.*

The government argues that the Russos lack standing to challenge the rule. It contends that the Russos may not rely on the veto provisions, which did not impact the rule, in advancing their Appointments Clause challenge. The First Circuit recently agreed with the government in a similar Appointments Clause lawsuit. *See New England Fishermen's Stewardship Ass'n v. Lutnick*, 174 F.4th 263, 281 (1st Cir. 2026). But we disagree with the First Circuit and join the two circuits that have reached the merits of similar challenges. *See Lofstad*, 117 F.4th at 497, 500; *Arnesen*, 170 F.4th at 975, 979 n.11.

To have standing, a plaintiff must satisfy three elements. First, a plaintiff must have suffered an injury in fact that is both concrete and particularized, and actual or imminent, not hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Second, there must be a causal connection between the injury and the defendant's conduct. *Id.* The injury must be "fairly traceable" to the defendant's conduct. *Id.* at 560-61 (citation modified). Third, the injury must be redressable by a favorable decision. *Id.* at 561.

The Russos have suffered a cognizable injury. The Russos allege that the rule prevents them from catching and selling more fish—"a classic pocketbook injury." *See Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023). They also argue that the Secretary lacked the power to promulgate the rule because it was proposed by unconstitutionally appointed Councilmembers. When a statute "violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court." *Seila Law*

*LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)); *see also Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191 (2023) ("being subjected to unconstitutional agency authority" inflicts a cognizable injury) (citation modified)).

The Russos' injury is fairly traceable to the Secretary's conduct. Fair traceability does not require a showing of proximate cause and may be met even where the plaintiff's injury was "indirectly caused" by the defendant's conduct. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). Here, the Council proposed the rule, and the Secretary adopted it without any edits. The Russos' injuries are thus traceable to the Secretary's allegedly unlawful decision to promulgate the rule.

Contrary to the government's argument, the Russos do not need to prove that their injury is traceable to any particular provision of the Act. *See Collins v. Yellen*, 594 U.S. 220, 243 (2021) ("[T]he relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." (citation modified)). The Supreme Court has rejected a similar argument before. *See Freytag v. Comm'r*, 501 U.S. 868, 882 (1991) (rejecting argument that petitioners lacked standing to bring appointments challenge based on significant powers that were not used in their case). Because the Russos' concrete injury flows from the Secretary's adoption of the rule, the traceability element is satisfied.

Finally, on the Russos' theory, a favorable decision would redress the Russos' injury. Vacating the rule would allow the Russos to catch more fish. To be sure, to justify vacatur, the Russos must establish a constitutional infirmity that warrants vacating the gag grouper rule. But that is a question about remedies, not standing. *See Collins*, 594 U.S. at 258 n.24 (having standing to challenge an executive officer's actions "does not mean that actions taken by such an officer are void *ab initio* and must be undone").

Because all three elements of standing are satisfied, the Russos have standing to bring their claims. *See Lujan*, 504 U.S. at 560-61.

*B.*

With the Russos' standing established, we now reach the merits. The Russos argue that the Councilmembers must be appointed by the President or Secretary and be removable at will. The Appointments Clause provides that "Officers of the United States" must be nominated by the President and confirmed by the Senate. There is an exception for inferior officers, whose appointment Congress may "by Law vest" in the President, courts of law, or the "Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. The Supreme Court has also explained that, at least in some cases, the Vesting and Take Care Clauses grant the President power to remove executive officers. *Trump v. Slaughter*, 146 S. Ct. 2283, 2292-93, 2310 (2026).

Both of the Russos' claims—improper appointment and removability—therefore turn on whether the Councilmembers

(1) "occupy a continuing position established by law" and (2) "exercise[] significant authority pursuant to the laws of the United States." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (citation modified). No one disputes that the first element—occupying a continuing position established by law—is satisfied here. *See* 16 U.S.C. § 1852(b), (d), (h). Our focus is therefore on the second element: whether the Act grants Councilmembers "significant authority." *Lucia*, 585 U.S. at 245. Although the Supreme Court has not defined "significant authority," *id.* at 246, it "evaluates a range of factors, including the scope and breadth of the individual's authority, the degree of discretion afforded, and the individual's procedural powers, among other things," *United States v. Avalos*, 162 F.4th 948, 957-58 (9th Cir. 2025) (collecting decisions).

Focusing on the element of significant authority, the Russos identify four parts of the Act that they say grant the Council significant authority: the Council's power to propose FMP amendments and regulations; its ability to assemble an administrative record; its emergency powers; and the three veto provisions. Of these powers, only the first two were used in proposing the rule. The Russos also cite several non-Act statutes they believe confer significant authority on the Council.

We address each argument in turn.

1.

We will start with whether the Council's power to propose FMP amendments and regulations is significant. The Russos argue that the Secretary cannot reject the Council's proposals at will, and

that "his review is limited to a lawfulness determination." Appellants' Br. at 36. They point out that FMP amendments become binding upon secretarial inaction, and that the Secretary must "consult with the Council" before he may revise proposed regulations. 16 U.S.C. § 1854(b)(3). We disagree. Because these provisions are properly read to allow the Secretary to reject or amend the Council's proposals before they have the force of law, the Council's proposal authority is not significant.

An advisory body's power to make "non-binding recommendations" is not significant. *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). In fact, it is not executive authority at all. Executive power includes the power to issue generally applicable decisions like rules and advisory opinions, *see Buckley v. Valeo*, 424 U.S. 1, 140-41 (1976), or adjudicate public rights by conducting trials, taking testimony, ruling on admissibility of evidence, or enforcing compliance with orders, *see Freytag*, 501 U.S. at 881-82; *Lucia*, 585 U.S. at 248. The authority to advise is a far cry from these kinds of "executive decision-making power[s]." *Florida v. Sec'y, U.S. Dep't of Educ.*, 180 F.4th 1340, 1346 (11th Cir. 2026).

Because the Secretary may decide whether to adopt or reject the Council's proposals, we think the Council's proposal power is best understood as advisory. Although the Council may "[p]ropose[]" regulations, 16 U.S.C. §§ 1853(c), 1854(a), its proposals have no binding effect on third parties without the Secretary's approval. A proposed FMP amendment "take[s] effect as if approved" upon secretarial inaction, *id.* § 1854(a)(3), but approval

of an FMP amendment "does not adversely affect anyone" because FMPs cannot bind third parties absent implementing regulations. *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1464 (9th Cir. 1987); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008). FMPs may affect state regulation in international waters, *see* 16 U.S.C. § 1856(a)(3), but this power is nonetheless dependent on the Secretary allowing the FMP to become effective in the first place. And even if the FMP takes effect without the Secretary's explicit approval, "it is still at the discretion of the Secretary." *Arnesen*, 170 F.4th at 977.

In addition to retaining final decision-making authority, the Secretary has broad discretion to reject the Council's proposed FMP amendments. For instance, the Secretary may reject FMP amendments if they are inconsistent with "the national standards, the other provisions of [the Act], and any other applicable law." 16 U.S.C. § 1854(a)(1)(A). As our sister circuits have recognized, the national standards are policy-laden and require significant independent judgment by the Secretary. *NEFSA*, 174 F.4th at 277; *All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996). Additionally, nothing in the Act prohibits the Secretary from rejecting proposals on policy grounds. *See Lofstad*, 117 F.4th at 500 (holding that the Act "does not expressly condition disapproval on a conflict with law").

The Secretary also has broad discretion to reject proposed regulations. In this case, the Secretary considered the National En-

vironmental Policy Act, Coastal Zone Management Act, Endangered Species Act, Marine Mammal Protection Act, and several executive orders before deciding to promulgate the rule. This process required the Secretary to exercise discretion and independent judgment.

Our interpretation of the Act is consistent with longstanding Executive Branch practice. The Executive Branch has consistently treated the Council's proposals as "advisory only." *See* Presidential Statement on Signing the Modernizing Recreational Fisheries Management Act of 2018, 2018 DAILY COMP. PRES. DOC. 00877 (Dec. 31, 2018); Presidential Statement on Signing the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, 43 WEEKLY COMP. PRES. DOC. 31-32 (Jan. 12, 2007); Presidential Statement on Signing the Sustainable Fisheries Act, 32 WEEKLY COMP. PRES. DOC. 2040-41 (Oct. 11, 1996). We have previously relied on signing statements as a permissible tool of statutory interpretation. *See United States v. Fisher*, 22 F.3d 262, 268 (11th Cir. 1994). "[C]onstruction by the Chief Executive, being both contemporaneous and consistent, is entitled to great weight," *Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 116 (1947), especially where, as here, it concerns relationships between officials within the Executive Branch. After all, the Council cannot "wield" significant authority as a practical matter if the executive treats it as purely advisory. *Lucia*, 585 U.S. at 245.

The Russos argue that section 1854(b)(3)'s consultation requirement permits the Council to block the Secretary from revising

its proposals by refusing to meet with him. We reject this argument, as has every circuit to consider it. *See Lofstad*, 117 F.4th at 500; *Arnesen*, 170 F.4th at 977; *NEFSA*, 174 F.4th at 277. The plain text of section 1854(b)(3) simply requires the Secretary to seek the Council's advice before revising a proposed rule. *Consult*, WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 179 (1963) ("to ask the advice or opinion of"). This procedural requirement is satisfied if the Secretary solicits the Council's input, even if the Council refuses to provide it. *See Fishing Co. of Alaska, Inc. v. Gutierrez*, 510 F.3d 328, 333 (D.C. Cir. 2007) (the "power to alter the rule before it becomes final rests only with the Secretary").

In short, the Council's proposals are purely precatory, cannot bind third parties, and may be rejected or revised by the Secretary. We therefore conclude that its power to propose is not significant. *See Kennedy*, 606 U.S. at 761. But were there any doubt, we would be obliged to choose a plausible interpretation that avoids placing the Act's constitutionality in question. *See Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1252 (11th Cir. 2022) (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 247 (2012)). Because we may plausibly interpret the Council's proposal power as purely advisory, we do so. *Id.*; *see Lofstad*, 117 F.4th at 500 (same); *Arnesen*, 170 F.4th at 976 (same).

2.

We likewise conclude that the Council's ability to compile a record is not significant. The Russos argue that the Council "critically shapes" the administrative record by collecting public comments, compiling data, and describing the fishery as part of the process of drafting FMP amendments. Appellants' Br. at 35-36. But the Council cannot limit the Secretary to its record, and the Act requires the Secretary to receive and consider public comments and the views of other agency heads when reviewing proposals. 16 U.S.C. § 1854(a)(2)(A)-(C); *see Arnesen*, 170 F.4th at 978 (concluding the same); *NEFSA*, 174 F.4th at 279 (same). Its power is not significant. *Cf. Lucia*, 585 U.S. at 248 (holding that an ALJ's ability to shape the record was significant when it included the power to rule on the admissibility of evidence).

3.

We now turn to the Council's emergency powers (which it did not use in this case). We believe these powers are insignificant. Upon a unanimous vote by the Council, the Secretary must promulgate emergency regulations. 16 U.S.C. § 1855(c)(2)(A). But the Council cannot dictate the contents of the regulation. And, because the NMFS regional director is the Secretary's subordinate on the Council, the Secretary may direct him to vote against such a measure. We join the Third and Fifth Circuits, which have reached the same conclusion. *See Lofstad*, 117 F.4th at 500-01; *Arnesen*, 170 F.4th at 977-78.

In support of their position, the Russos cite *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021). There the Supreme Court held that the "unreviewable authority wielded by [Administrative Patent Judges] during inter partes review is incompatible with their appointment . . . to an inferior office." *Id.* at 23. The Court rejected the argument that the Secretary's ability to remove APJs after they render a final decision was sufficient oversight. *Id.* at 16-17. The Russos contend that the Secretary's oversight of the regional director is likewise insufficient. But the problem in *Arthrex* was that the Secretary had "no means of countermanding the final decision already on the books." *Id.* at 16. Here, the Secretary's ability to prevent a unanimous vote means the Council may render a binding decision only with his permission.

4.

Next, we ask whether the Council's veto powers—also irrelevant to the rule's creation—are significant. We agree with the Russos that they are. These provisions permit the Council to block the Secretary from establishing limited-access fisheries, delegating fishery management to the states, or repealing an FMP. 16 U.S.C. §§ 1854(c)(3), (h), 1856(a)(3)(B). The Secretary cannot override the Council's veto. Because the veto gives the Council—not the Secretary—the final word, it "thwart[s] th[e] chain of command." *Lofstad*, 117 F.4th at 500. Although the government considers the provisions "ancillary," Appellee Br. at 15, the veto's "mere existence" can "deter[] expansive measures that might provoke it," *Lofstad*, 117 F.4th at 499; *Arnesen*, 170 F.4th at 975 (citing *Lofstad*).

We agree with the Third and Fifth Circuits that the veto provisions confer significant authority on the Council.

5.

Finally, we note that the Russos cite several statutes outside the Magnuson-Stevens Act for the proposition that the Council has substantial authority. One allows the Council to restrict foreign fishing permits for Atlantic herring and Atlantic mackerel only. Pub. L. 104-43, 109 Stat. 366, Title VIII § 802 (1995). Under another, the Council may require the Secretary to order natural resource "observers" to collect "additional information." 16 U.S.C. § 1383a(e)(4). The district court correctly found that these limited powers are insignificant.

* * *

The Councilmembers occupy continuing positions established by law and exercise significant federal authority by virtue of the Council's veto powers. *See Lucia*, 585 U.S. at 245. These kinds of officials must ordinarily be removable and appointed by "the President, a court of law, or a head of department." *Id.* at 244; *Slaughter*, 146 S. Ct. at 2310. At least six of the Councilmembers were not appointed by any of these actors. *See* 16 U.S.C. § 1852(a)(1)(E), (b)(1)(A)-(B). And, as we have already noted, there are limits on their removability.

*C.*

Having identified a constitutional infirmity in the Act, we now turn to the question of remedy. The parties agree that we

must provide the narrowest possible remedy and ignore unconstitutional portions of the Act. They disagree, however, about the best way to do so. We have concluded, like the Third and Fifth Circuits, that the Council's veto powers give it significant authority, but all agree that the veto powers had no effect on the gag grouper rule. The Russos request that we nonetheless vacate the rule, which they argue was tainted by an appointment and removability defect. The government says that we should preserve the appointment and removal provisions. It argues that, because the veto powers had no effect on the rule, vacatur of the rule is unwarranted.

We agree with the government. "When confronting a constitutional flaw in a statute, we try to limit the solution to the problem by disregarding the problematic portions while leaving the remainder intact." *Arthrex*, 594 U.S. at 23 (citation modified). Ours is the "'negative power to disregard,'" not the positive power to "creat[e] offices, terms, and the like." *Seila Law*, 591 U.S. at 237-38 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)). Such "editorial freedom" belongs to Congress. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010).

Here, the narrowest constitutional remedy would be to ignore any of the Council's acts under its veto provisions, not to require every member of the Council to be nominated by the President and confirmed by the Senate. Under that alternate statutory scheme, it's not clear how the geographical appointment restrictions on each position could be preserved. Likewise, there

would be no role on the Council for representatives of state governments. We see no reason to believe that Congress would prefer a Senate-confirmed Council without removal restrictions to a purely advisory Council that balances regional and state interests in the way Congress clearly envisioned. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (considering legislative intent in resolving a constitutional flaw in a statute). After all, the Executive Branch has long treated the Council as an advisory body without any Congressional intervention.

Our approach mirrors the one adopted in *Arthrex*. After holding that the Administrative Patent Judges' unreviewable authority was incompatible with their status as inferior officers, the Supreme Court chose between several possible remedies: requiring the Administrative Patent Judges to be appointed by the President and confirmed by the Senate, requiring they be removable at will, or subjecting them to greater oversight by a principal officer. 594 U.S. at 23, 26-27. Because the Administrative Patent Judges were inferior officers "[i]n every respect save the insulation of their decisions from review," the Court decided that the narrowest remedy was to permit the Director of the Patent and Trademark Office to review their decisions. *Id.* at 24-25. Although at-will removal or Senate confirmation could have theoretically cured the constitutional problem, executive oversight "better reflect[ed] the structure of supervision within the PTO and the nature of APJs' duties." *Id.* at 26. Similarly, in every respect save the veto powers, the Council is an advisory body not subject to the Appointments Clause. As in *Arthrex*, the narrowest remedy is not to address the appointment

process or removal restrictions, but the misallocation of authority to the Council.

It follows that there is also no need to vacate the gag grouper rule. Vacatur may have been appropriate if the Council had used its significant veto powers to create the gag grouper rule. *See Collins*, 594 U.S. at 266-67 (Thomas, J., concurring) (unconstitutionally appointed officers may not "exercise the powers of the office"); *id.* at 283 (Gorsuch, J., concurring in part) ("[O]fficials cannot wield executive power except as Article II provides."). Indeed, in the precedents the Russos cite in support of vacatur, the unconstitutionally appointed officer(s) exercised significant authority to harm the plaintiff. *See Lucia*, 585 U.S. at 251; *Ryder v. United States*, 515 U.S. 177, 179, 188 (1995); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1335, 1337-38 (D.C. Cir. 2012). But all agree that the veto powers had nothing to do with the rule at issue. Instead, the Council made an advisory proposal, which the Secretary independently adopted. This two-step process, as we have explained, does not involve the exercise of significant authority by the Council. *See Florida*, 180 F.4th at 1346-48. Because the Secretary exercised the authority to promulgate the regulation independent of any authority of the Council, the Appointments Clause does not justify invalidating the gag grouper rule. We therefore join our sister circuits and hold that, because the gag grouper rule was not affected by an unconstitutional part of the Act, vacatur is inappropriate. *See Lofstad*, 117 F.4th at 501; *Arnesen*, 170 F.4th at 979-80.

Although the district court properly denied the Russos relief from the gag grouper rule, it styled its order as granting their motion for summary judgment in part and ordered that the veto powers "be severed from the Act as unconstitutional." But the district court's order did not remedy any of the Russos' alleged injuries. Accordingly, the district court should have instead granted judgment for the government. *See Arnesen*, 170 F.4th at 980. We therefore remand with instructions for the district court to enter judgment for the government.

**IV.**

We **VACATE** and **REMAND** for the district court to enter judgment for the government consistent with this opinion.

WILLIAM PRYOR, Chief Judge, Concurring:

I concur in full. But I write separately to address a common misconception about federal judicial power. When the district court entered its judgment, it purported to excise three statutory provisions from the United States Code with the following decree: "The Court orders 16 U.S.C. §§ 1854(c)(3), 1856(a)(3)(B), and 1854(h) to be **SEVERED** from the Act as unconstitutional." It did so as if "a court's decision to sever a provision formally suspends or erases it, when the provision actually remains on the books as a law." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2220 (2020) (Thomas, J., concurring in part and dissenting in part) (citation modified). Yet "federal courts have no authority to erase a duly enacted law from the statute books." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 936 (2018); *see also Steffel v. Thompson*, 415 U.S. 452, 469 (1974) ("[A] favorable declaratory judgment . . . cannot make even an unconstitutional statute disappear." (citation modified)). "Under our constitutional framework, federal courts do not sit as councils of revision, empowered to rewrite legislation . . . ." *United States v. Rutherford*, 442 U.S. 544, 555 (1979). Indeed, the Constitutional Convention rejected the proposal of the Virginia Plan urged by James Madison and others to give federal judges that power. *See* Mitchell, *supra*, at 954–60.

Severability or separability is a question of statutory interpretation in a specific case. *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924) (severability is "a question of interpretation and of legislative intent"). *See generally* Robert L. Stern, *Separability and Separability*

*Clauses in the Supreme Court*, 51 HARV. L. REV. 76 (1937). "The question that severability poses is easily stated: If part of a statute is unconstitutional, does the rest of the statute remain in effect?" John Copeland Nagle, *Severability*, 72 N.C. L. REV. 203, 204 (1993). "Sometimes the severability question is whether a linguistically identifiable part of a statute can survive after another part has been found invalid." WILLIAM BAUDE ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 234 (8th ed. 2025). But other times "the question will be whether a statutory provision that does not on its face reflect divisible linguistic units . . . can nonetheless be severed into valid and invalid elements, or whether valid applications can be separated from invalid ones." *Id.* Both scenarios "pose the interpretive question of how to understand a legal text as a whole in the light of a newly acknowledged fact—that part of the text cannot be given legal effect." *Lester v. United States*, 921 F.3d 1306, 1314 (11th Cir. 2019) (W. Pryor, J., statement respecting the denial of rehearing en banc). That is, "the severability doctrine has courts decide how a statute operates once they conclude that part of it cannot be constitutionally enforced." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 489 (2018) (Thomas, J., concurring).

To be sure, "the answer can have profound consequences." Nagle, *supra*, at 204. For example, "[c]oncluding that statutory provisions are severable presents the danger of leaving in effect statutory provisions that the legislature would have never enacted alone." *Id.* Or the alternative might be untenable: "an entire appropriations statute or sweeping reform legislation falls because of a

single unconstitutional provision." *Id.* Even then, the result is case and party specific, though *stare decisis* controls meaning when the holding is precedential. BRYAN GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT at 38 (2016) ("The old maxim is *legis interpretatio legis vim obtinet*—that is, 'the interpretation of law obtains the force of law.'"). Of course, trial courts create no precedent. *Id.* at 255. And even the decision of the Supreme Court of the United States does not erase a law from the code. *See Lester*, 921 F.3d at 1315 (W. Pryor, J., statement respecting the denial of rehearing en banc) ("The interpretive character of severability holdings—*Booker*'s included—also means that they cannot be understood as if they *changed* the law in the manner of a legislative amendment.").

Only Congress has the power to amend or repeal federal laws. *See* U.S. CONST. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."). Judicial power is "more limited." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020). When deciding a case or controversy that requires an exercise of judicial review, U.S. CONST. art. III, § 2, a court can enjoin or refuse enforcement of an unconstitutional law to redress harm to a party who has standing to sue. *See* Mitchell, *supra*, at 936. But it cannot repeal a statute or any portion of it. When a district court purports to do so, its decree is a nullity.

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 03, 2026

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 26-10171-AA
Case Style: Dominick Russo, et al v. Secretary, U.S. Department of Commerce, et al
District Court Docket No: 1:24-cv-00186-JB-M

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. The Court has proposed amending 11th Cir. R. 40-1 (Number of Copies) to no longer require paper copies of a petition for panel rehearing or a petition for rehearing en banc. Based on the proposed amendment, other than an original petition filed in paper by a non-electronic filer, **parties are asked not to submit any paper copies** of a petition for panel rehearing or a petition for rehearing en banc.

Costs
Each party to bear its own costs.

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |